### HART-PARR CO. v. BARKLEY et al.

### In re TUXHORN.

(Circuit Court of Appeals, Eighth Circuit. February 28, 1916.)

No. 158.

1. BANKRUPTCY ⊚⟶440—PETITION TO REVISE—ORDER TO VACATE ADJUDICATION.

   Since an order denying the application of a creditor to vacate an adjudication in bankruptcy is not appealable, questions of law raised by it may be reviewed by petition to revise.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 915; Dec. Dig. ⊚⟶440.]

2. BANKRUPTCY ⊚⟶68—INVOLUNTARY PROCEEDINGS—PERSONS EXEMPT—"FARMING"—"TILLAGE OF THE SOIL."

   In Bankr. Act July 1, 1898, c. 541, § 4b, 30 Stat. 547 (Comp. St. 1913, § 9588), exempting from being adjudicated an involuntary bankrupt those engaged chiefly in farming or the tillage of the soil, the word "farming" and the words "tillage of the soil" mean the same thing; and while the threshing by a farmer of his own grain belongs to the industry of farming, one who is chiefly engaged in threshing for hire grain raised by others is not within the exemption.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ⊚⟶68.

   For other definitions, see Words and Phrases, First Series, Farming; Tillage.]

Petition to Revise Order of the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

In the matter of Julius Tuxhorn, bankrupt. Petition of the Hart-Parr Company, a corporation, against Adam Barkley and another, to revise an order of the District Court denying petitioner's application to vacate the adjudication. Petition to revise denied.

---

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Chester I. Long, of Wichita, Kan. (A. G. C. Bierer, of Guthrie, Okl., and A. M. Cowan, of Wichita, Kan., on the brief), for petitioner.

Jesse D. Wall and E. L. Foulke, both of Wichita, Kan. (C. A. Matson, of Wichita, Kan., on the brief), for respondents.

Before ADAMS and CARLAND, Circuit Judges, and TRIEBER, District Judge.

CARLAND, Circuit Judge. [1] This is a petition to revise an order of the District Court of the Western District of Oklahoma, denying the application of the Hart-Parr Company, a creditor, to have the judgment of said court, which adjudicated Julius Tuxhorn an involuntary bankrupt, vacated and set aside. As such an order is not appealable, it would seem that as to matters of law it may be reviewed by a petition to revise. B-R Electric & Telephone Manufacturing Co. v. Ætna Life Insurance Co., 206 Fed. 885; 124 C. C. A. 545.

[2] The application to vacate the adjudication of bankruptcy alleged as the ground thereof that the alleged bankrupt, Tuxhorn, at the time the involuntary petition was filed, to wit, January 30, 1915, was a person chiefly engaged in farming or the tillage of the soil, and therefore could not be adjudicated an involuntary bankrupt. The court took the evidence upon this question and found the facts as follows:

"The bankrupt, prior to 1912, leased for three years the Nelson farm and the Adam-Barkley farm, each being a quarter section, and was the owner of another quarter section in the same locality, which he acquired on May 5, 1911, where he had his residence and home until he left the state of Oklahoma in November, 1914. He farmed said tracts in 1912, and planted crops thereon in 1913, but did not raise much crop; the season being dry. In the spring of 1914, he plowed 60 to 70 acres on his own land, and planted about 25 acres in kaffir and maize thereon, and 8 to 10 acres in kaffir on the Nelson farm, but did not cultivate said crops, and the same were sold under attachment for about $36. He also raised about 115 bushels of wheat on his own land in the year 1914, and sold the same for $103.50; also raised there a small amount of barley. He owned and kept on his farm 6 to 8 head of horses and a few chickens, and used one or two of these teams in his threshing business. He did not raise sufficient feed on his farm for his horses, and bought feed for them in the spring of 1914. He did not cultivate or plant upon the Barkley farm in the season of 1914.

"The bankrupt was a single man. He kept his clothes, trunk, and papers in the house on his land, and on September 19, 1914, asked a Mr. Andrews and his wife, who resided there since that date and were employed with his threshing crew from about August 3, 1914, to September 19, 1914, to stay there until spring and harvest the kaffir and maize planted thereon. The total value of all crops raised in 1914 upon his land and the leased land was not over $250. From April 1, 1914, until August 1, 1914, he was on his land less than half the time, and after the threshing season began he was there on Sundays and when it rained. No plowing was done thereon after September 19, 1914. It was his custom to leave his farm for several days or weeks at a time, and turn on a windmill to furnish water for his horses and leave them in the pasture. When he was last at the farm his personal property there consisted of two two-row listers belonging to the engine, another lister, two wheat drills, three discs, three wagons, and some other small machinery. The bankrupt stated to one party in August, 1914, that he had to make a stake at threshing or 'go broke,' and that he had made nothing at farming, and in the winter of 1913–14 he advised another party to buy a threshing outfit, that he could make money thereby, and that he had just as

well 'cut out' this farming business first as last, and that he, the bankrupt, had tried it, but there was nothing in it, and that he had quit farming.

"The bankrupt purchased, in the season of 1910, or 1911, a J. I. Case threshing outfit, consisting of a steam tractor, separator, and attachments and equipments, securing the cost by mortgages thereon and on 100 acres of wheat and on his farm. He also purchased an eight-bottom gang plow, which was used in connection with the tractor engine, for plowing for others for hire, and a two-row lister, also used with the tractor engine, and prior to July, 1914, he used all of the above in plowing and listing for others and on his own land. About July 1, 1914, he leased the J. I. Case outfit, complete, to other parties to be run on equal shares. In July, 1914, he bought of the Hart-Parr Company another complete threshing outfit, heretofore referred to, the engine of which was a gas tractor, suitable for running a threshing machine and for plowing and hauling. He operated this latter outfit, employing eight to ten hands, the daily expense being about $35 to $40, from about August 1, 1914, until he left Beaver county, Okl., for parts unknown, on November 25, 1914, and when it was too wet to thresh he used the said gas tractor in plowing for others for hire. He was observed to compute the amount of his wheat threshing at 35,000 to 40,000 bushels.

"It is shown by a bank account that he received, for threshing, the season of 1914, $2,625, and had an overdraft of $167; but it does not appear what, if any, his other receipts were therefrom, nor what he received from the 'Case' outfit. The average daily run of the Hart-Parr machine was 700 to 900 bushels, and the charge 6 to 7 cents a bushel for threshing wheat. The petitioning creditor did not attempt to show the entire indebtedness of the bankrupt. It does appear that he is indebted to the J. I. Case Company about $1,817, owes $500 as a farm loan on his land, paid on the cost of the 'Case' outfit, $300 for repairs thereon, $249 to the Kan-O-Tex Oil Company for gasoline and oil furnished to him in the fall of 1914, the said debt to the Hart-Parr Company, and a number of merchandise accounts, ranging from $30 to $150, all being contracted for threshing outfits and in the operation of the same.

"The threshing season for wheat in Beaver county, Okl., extends from about July 1st until late fall. He was still threshing when he left the state in November, 1914. After the wheat threshing season there is a threshing season for kaffir corn and maize, which continues until early spring. In March, 1915, such threshing was going on in said Beaver county. The threshing season of 1912 began in July or August, and continued into the following March. In 1913 the season was shorter, owing to the scarcity of crops."

The court concluded as matter of law from these facts that Tuxhorn was chiefly engaged in threshing for others for hire, and therefore was not chiefly engaged in farming or the tillage of the soil.

The words "farming or the tillage of the soil," as used in subdivision "b" of section 4, Act of July 1, 1898, express the same thought; that is, the word "farming" and the words "tillage of the soil" mean the same thing. Counsel for the petitioner contend that the trial court erred in confusing the meaning of the word "farming," which relates to an industry, with the meaning of the word "farmer," which relates to an occupation; that while the facts proven might sustain the conclusion of the court that Tuxhorn was not a farmer, they do not sustain the conclusion that Tuxhorn was not engaged in farming, because, as counsel insist, the threshing of grain is farming, although Tuxhorn might not have been a farmer.

We think, speaking generally, without reference to the facts in this case, that the threshing of his own grain by a farmer belongs to the industry of farming; but the statute provides that a person, in order to be exempted from being adjudicated an involuntary bankrupt, must be engaged chiefly in farming or the tillage of the soil, and the

determination of whether Tuxhorn is within the exemption must be determined from the facts in this case, and we entirely agree with the trial court that Tuxhorn was not chiefly engaged in farming or the tillage of the soil, but that he was chiefly engaged in the business of threshing grain for others for hire, which in our opinion is not farming. The purchase within about four years of two complete threshing outfits, when considered with reference to the amount of grain raised by Tuxhorn and the amount of revenue received from threshing for others for hire, shows what he was chiefly engaged in.

Counsel cite the standard dictionaries, and the use of the word by the Census Bureau; but we must confine ourselves to the statute and to the facts shown in this particular case; and within those limits we have no question but that the conclusion of the court below from the facts found was right, and therefore the petition to revise must be denied.

And it is so ordered.