In re SPENGLER.

(District Court, S. D. Iowa, Davenport Division. December 20, 1916.)

1. BANKRUPTCY ⊙═91(2)—INVOLUNTARY PROCEEDINGS—INDEBTEDNESS.

In 1914 the alleged bankrupt and another entered into contracts by which they agreed to clear and put into crop 80 acres on each of a number of intended homesteads in Utah. The contracts provided that the work should be started as soon "as the weather permits," and that 40 acres on each tract should be put under cultivation by January 1, 1916. When the petition was filed on December 11, 1915, nothing had been done to comply with the contracts, nor at the time of the hearing several months later. The bankrupt and his associates had received payments on the contracts in excess of $4,000. *Held*, that the facts were sufficient to show a breach of the contracts, and that the bankrupt owed provable debts thereon exceeding the statutory requirement.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 138; Dec. Dig. ⊙═91(2).]

2. BANKRUPTCY ⊙═68—PERSONS WHO MAY BE ADJUDGED BANKRUPT—PERSONS "CHIEFLY ENGAGED IN FARMING.

A man who cultivates "about two acres" of ground, and has 35 bushels of corn, 1 horse, 4 head of cattle, and a few dollars' worth of implements, but who has various outside interests, is not "chiefly engaged in farming," within the meaning of Bankr. Act July 1, 1898, c. 541, 30 Stat. 544.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ⊙═68.]

⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Bankruptcy. In the matter of William Spengler, bankrupt. On involuntary petition, and exceptions to report of special master thereon. Exceptions overruled, and order of adjudication.

Wm. Hoersch, of Davenport, Iowa, and R. W. Olmsted, of Rock Island, Ill., for bankrupt.

Isaac Petersberger, of Davenport, Iowa, and Albert Huber, of Rock Island, Ill., for creditors.

WADE, District Judge. The petition by creditors, alleging insolvency and acts of bankruptcy, was filed December 11, 1915. The answer of the alleged bankrupt was filed December 27, 1915. Nothing further was done in the matter until February 5, 1916, when it was referred to Special Master Williamson, for whom, on March 30, 1916, F. A. Cooper was substituted, and the case came on for hearing before the special master, May 22, 1916. Report of special master was filed June 23, 1916, and thereafter exceptions were filed thereto, and argued before the court. I have reviewed the evidence fully with reference to the following questions: (1) Provable debts. (2) Insolvency. (3) Whether Spengler was chiefly engaged in farming. (4) Acts of bankruptcy.

[1] First. It appears from the record that in 1914 parties with whom Spengler was in some relation associated, by advertising and other ways, induced some 14 people to enter into contracts to pay $125 each for the location of homesteads in Utah, and 13 of these persons, as I understand the record, entered into a contract with Spengler & Crawford, by which they obligated themselves "to clear off, plow, and seed to wheat 80 acres of land," which it was contemplated would be part of the homestead located as aforesaid. It was specifically provided that 40 acres "shall be cleared off, and shall be under cultivation on or before January 1, 1916; 40 acres more on or before January 1, 1917," and it was specifically provided that "second party shall start the improvement of the above said land as soon as the weather permits in San Juan county, and complete it as soon as possible." Later Crawford went into bankruptcy. Spengler wrote the parties that he would carry out the contracts, but on December 11, 1915, nothing was done, and at the time of the hearing in May, 1916, nothing appears to have been done to in any manner carry out these obligations. Each of 13 persons paid these parties, as I understand it, $325 cash, and obligated themselves to execute notes for $300 more. Whether the notes were actually executed, and, if so, what became of them in all cases, does not specifically appear; but it does appear that Spengler, or Spengler & Crawford, received $4,225 in cash, and it does appear that up to the time of the hearing nothing was given in return therefor.

It is strenuously urged that the question of whether there was any liability for repayment of the money, or damages, must be determined with reference to the specific question as to whether the contract was "breached" on December 11, 1915; and it is earnestly contended that no such breach occurred at that time, because it is contended Spengler had until January 1st, 20 days later, in which

to comply with the contracts. That this view is entirely erroneous is clearly shown by the above quotations from the contracts. It is true that it specifies that the 40 acres is to be cleared off and under cultivation on or before January 1, 1916; but it is also true that the contracts specifically provide that "second parties shall start the improvement of the above said land as soon as the weather permits in San Juan county, and complete the same as soon as possible." No contention is made that the weather did not permit the commencement of the improvement before December 11th, and no one can seriously contend that within the 20 remaining days the 40 acres could have been plowed and put under cultivation, and no one even pretends that there was any intention to do so, and from the fact that up to the time of the hearing, so far as the record shows, no steps were taken to in any manner comply with the contracts, it may be fairly inferred that Spengler did not have any intention on December 11th of attempting to comply with the contracts.

It is true that the bankruptcy proceeding is pointed out as an obstacle, but it does not appear that his property was taken out of his hands, or that any obstacle was placed in the way of the performance of these contracts, if Spengler seriously intended to perform them, and the delay in bringing the matter to trial does not indicate any purpose upon the part of Spengler to attempt the performance of these contracts; in fact, my recollection is that the appointment of the special master was upon my own motion, and not upon any request by the parties. Of course, to furnish the foundation for a claim for breach of contract, the breach must have occurred prior to December 11, 1915; but evidence as to subsequent acts and conduct is admissible to determine whether or not there had at that time been a breach, and under all the circumstances, if at that time Spengler had no intention of carrying out the contracts, there could be no question but what there was a breach. In fact, in view of the requirement that work should commence as soon as the weather would permit, there can be no question but what there was a breach," regardless of his then intention. There being a breach, the parties who paid the $4,225 certainly had claims which they would have a right to assert in court. The court cannot always determine specifically the absolute liability upon a petition in bankruptcy. That matter cannot be adjudicated as to all the parties; but I hold that, under the facts in this case, Spengler was owing provable debts, within the meaning of the law, in excess of the statutory requirement.

Second. As to solvency, the testimony of Spengler is extremely unsatisfactory. The promissory notes and obligations are apparently of small value; at least, there is no competent proof of the solvency of the parties owing them, and in some cases the alleged bankrupt does not even know where they live. Upon the evidence before the court, no broker or bank would pay for these notes and obligations, in my judgment, to exceed 10 cents on the dollar. They appear like a lot of "odds and ends," and the financial condition of Spengler during the past couple of years leads me to believe that, if these notes were collectible by legal process, most of them would

have been enforced before this time. The balance of the assets, consisting of machinery and interest in some Minnesota or Wisconsin land, is all of doubtful value. Every lawyer knows what secondhand machinery will bring at a cash sale, and the testimony as to values of Wisconsin and Minnesota lands referred to is entirely unsatisfactory. All of the assets are of such uncertain value, scattered in so many places, and mixed up with so many elements of incumbrance, that I have no hesitation in saying that Spengler has failed to prove that he was solvent.

[2] Third. Was Spengler chiefly engaged in farming? In view of the extended interests and property rights claimed to be owned by Spengler, and in view of his various activities, manifested by the facts and circumstances more than by the direct evidence, I cannot hold that Spengler was engaged chiefly in farming. Upon his own testimony, as to the amount derived from his "farm" and his garden, and fruit and eggs, and everything else, it must be apparent that he could not pay running expenses from his income from those sources. Spengler could be more properly designated as a "gardner." A man cannot be properly classed as a farmer who "farms about two acres," who had about 35 bushels of corn, one horse, a cultivator worth $5, a plow worth $8, two cows, and two heifers; a man cannot be properly classed as a farmer who buys hogs, buys the feed for them, and sells them. A man is not a farmer who depends upon small amounts derived from eggs, fruit, and vegetables. "The word 'farming' and the words 'tillage of the soil' mean the same thing." Hart Parr Co. v. Barkley et al., 231 Fed. 913, 146 C. C. A. 109. A man who "tills" but two or three acres, and has a small pasture, is not engaged in tillage of the soil, nor in farming, within the ordinary meaning of the term.

The purpose of the statute must be considered. A man's outside activities must be considered. Congress did not have the intention of excluding from the statute such persons as engage in general business aside from farming, and it is apparent, from the notes owned by Spengler, the property owned by him, and the interests which he had, scattered as they were, that these outside interests must have engaged more of his attention than did farming. It is not a question of how much time a man puts in "farming"; that is only one element. The question of his interests and his activities, and the things that engage his attention, is what makes the distinction.

Fourth. As to the acts of bankruptcy I have no doubt. The explanation of Spengler that he wanted to "protect" his wife can have no meaning than that she should have financial protection, or property protection, in case financial trouble should come. He disposed of the things which he owned, having substantial value and known location, at a time when he had assumed grave obligations to petitioners and others. It strikes me that Spengler realized that complications and obligations might arise which would involve him in financial troubles with these people, and that he was providing "protection" for himself and family, and however commendable this

spirit may be from a standpoint of family obligations, it is contrary to well settled rules of law.

Finally. This whole case impresses me with the feeling that it is a case which calls for the interposition of the relief provided for in the bankruptcy statutes. Here are a lot of people who have been led to invest their money in an enterprise which has failed, and for the failure of which Spengler may be largely responsible in damages. The assets owned by Spengler are of such a nature that the appointment of a trustee in bankruptcy cannot seriously affect their value, nor can such proceeding seriously interfere with Spengler's activities. If the notes are collectible, it will be to his advantage to have them collected. The machinery, upon which he places such great value, will not lose any of that value by being taken in charge by a trustee, and so far as the use of the machinery is concerned, pending the question of adjudication of liabilities, the trustee will be under orders of the court, and arrangements can certainly be perfected by which Spengler can have the use of the machinery on proper terms and proper security. There will be no sacrifice of anything; in fact, if Spengler is solvent, as he claims, and the property is of the value claimed, he will have no difficulty in furnishing to the trustee such security as will satisfy all creditors, and arrangements certainly can be made for his possession of his assets. All that bankruptcy will mean is that his assets will be conserved for his benefit, as well as for the benefit of creditors, and the trustee appointed will perform no acts which will in any manner deprive the bankrupt of a dollar that he owns, unless the same is necessary.

The claims against Spengler will have to be liquidated, and the manner of liquidation, if it cannot be agreed upon, will be hereafter determined. This adjudication does not determine the invalidity of the transfers of the real estate, except for bankruptcy purposes, because the proper parties are not before the court. A square deal to everybody, in my judgment, warrants this proceeding; without it, by the time these various claimants can have their claims reduced to judgment, no one can tell where these assets will be, or what they will be worth, and common justice requires that they shall be held pending the determination of the rights of all the parties.

Record entry: And now, on this 20th day of December, 1916, the above-entitled cause having been heretofore tried and submitted, the court, being now fully advised, finds that William Spengler should be, and he is, hereby declared a bankrupt, as prayed, and the case is referred to F. A. Cooper, referee, for further proceedings under the law. To which William Spengler excepts.