In re BROWN et al.

(District Court, W. D. Washington, S. D. May 24, 1918.)

No. 2408.

1. BANKRUPTCY ⊂⊃68—APPLICATION OF ACT—"FARMING"—"TILLAGE OF THE SOIL."

Stock raising and dairying in connection with and incidental to tillage of the soil are in common parlance a part of farming, and therefore, though the word "farming," used in the Bankruptcy Act, is broader than "tillage of the soil," stock raising, etc., in order to be included therein, must be incidental to tillage of the soil.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Farming.]

2. BANKRUPTCY ⊂⊃68—PERSONS SUBJECT TO ACT—FARMING—TILLAGE OF THE SOIL.

Evidence *held* insufficient to show that the bankrupts were chiefly engaged in farming or tillage of the soil; it appearing that the greater proportion of the bankrupts' business was in the manufacture and resale of farm products, which they purchased and marketed as finished products.

In Bankruptcy. In the matter of the bankruptcy of A. L. Brown and the community composed of A. L. Brown and Emma Brown, his wife. On motion of the petitioning and certain other creditors for confirmation of the master's report, and exceptions to the report by the alleged bankrupts and another. Report confirmed.

Walter M. Harvey, of Tacoma, Wash., for petitioning creditors.

Bausman & Oldham, of Seattle, Wash., for intervener Seattle Nat. Bank.

Kerr, McCord & Carey, of Seattle, Wash., for intervener National Bank of Commerce.

Peters & Powell, of Seattle, Wash., for intervener Dexter-Horton Bank.

Herr, Bayley & Croson, of Seattle, Wash., for alleged bankrupts.

CUSHMAN, District Judge. The motion of the petitioning and certain of the other creditors for confirmation of the master's report and exceptions to the report by the alleged bankrupts and the Dexter-Horton National Bank, a creditor, are for determination. The controlling question is whether the finding of the master that the alleged bankrupts were not chiefly engaged in farming or the tillage of the soil is correct. Upon this question the master reports as follows:

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"By agreement of counsel the issues were narrowed down to the question of whether or not the alleged bankrupt, A. L. Brown, was chiefly engaged in farming at the time the alleged act of bankruptcy took place, and testimony was taken to that end. The alleged bankrupt, A. L. Brown, was a resident of Seattle and engaged in the practice of law there at and prior to 1914, and in that year bought the nucleus of what is now called the A. L. Brown farm, which contains about 2,100 acres, 1,300 acres of which is now under cultivation. This farm was stocked with a large dairy herd, and with horses, hogs, and chickens, and the land used for pasturage for the stock and for the growing of stock feed during all the time from his purchase up to the date of the alleged act of bankruptcy. Large amounts of money were invested in stocking the farm and in reclaiming a large part of the acreage by diking, building between eight and nine miles of diking thereon. The record does not disclose what amounts were so invested. During all of this time the Browns had their home on this farm, but maintained apartments in Seattle, where they spent much of their time; also, during all this time, A. L. Brown was president of the Amos Brown estate, which was his father's estate incorporated, with himself, his mother, and sisters holding all the shares, he holding a one-eighth interest; said estate having about $2,000,000 worth of property in Seattle, with about $350,000 worth of improvements thereon. The secretary of the Amos Brown estate looked after the details of its business, but the alleged bankrupt, A. L. Brown, handled all the important matters, and handled its important financial affairs. The alleged bankrupt, A. L. Brown, borrowed large amounts of money from the banks for the Amos Brown estate, and loaned himself large sums from the said estate; he now owing the said estate something like $500,000, though it does not clearly appear what he does owe the estate. As president of the Amos Brown estate he was allowed a salary of $3,000 per year, which was paid him until about three years ago, and since then his salary has only been credited to him on his account with the estate. He spent much of his time during 1917 in Seattle looking after the interests of the Amos Brown estate, as well as in soliciting orders for his A. L. Brown farm products, for which purpose he maintained office accommodations and a clerk. He borrowed large sums of money personally and in connection with the Amos Brown estate, which did not go into the farming; at least Mr. Brown, as a witness, was not willing to say it did. The several sums testified to were as follows:

| | |
|---|---:|
| Frank Donnelly | $19,900.00 |
| Christofferson | 20,000.00 |
| Ostrander | 20,000.00 |
| Canadian Bank of Commerce | 37,500.00 |
| Protective Investment Company | 50,000.00 |
| People's Savings Bank | 22,000.00 |
| Seattle National Bank | 72,000.00 |
| Union Savings & Trust Company | 83,500.00 |
| Frank Boguke | 3,000.00 |
| Cresswell | 18,000.00 |
| Bostwick | 13,000.00 |
| Capital City Bank | 8,000.00 |
| Bullock | 35,000.00 |
| Canadian Bank of Commerce | 15,500.00 |
| Corwin | 7,000.00 |

"On cross-examination, Mr. Brown qualified his testimony given on direct examination by stating that most of these loans went to the Amos Brown estate, but does not state that any of it went to the farm industries. He borrowed the money for the Amos Brown estate, and then borrowed a great deal of it from the estate. The alleged bankrupt invested about $50,000 or $60,000 in the packing plant, which was a part of the $125,000 loan made from Wells, Dickey & Co., of Minneapolis, and altogether expended about $85,000 on the packing plant, creamery, and dairy and poultry plant, all of which was borrowed, and not yet paid. In 1915, he sought to develop the trade of 'producer to consumer' under the 'parcel post' system, which he al-

lowed to stop when the army post was established here. In negotiating his loans from the National Bank of Commerce, he stated to the officer that he was branching out into the parcel post business, that he was selling to the consumer and also buying from his neighbors, buying a certain amount of stock from his neighbors. and the loan was for that business. In negotiating loans with the Seattle National Bank, he stated that he was putting on a sale of his stock, his blooded cattle; that he expected to derive from that sale $40,000 or $50,000, when he would repay the loan. He further stated to the bank president, Mr. Struve, that he realized that in order to make money he must make it from his packing plant; that he was not making any money out of his stock, and he was going to dispose of it. He states that he borrowed the money and erected his packing plant to take advantage of the parcel post business that he hoped to develop, and that his packing plant was an up-to-date plant, but small; that he had government inspection, which he secured because he could not get his products into certain markets without inspection. He continued the parcel post business up to the coming of the army post cantonment. He quit the parcel post business, because the government changed the train service, which the government had theretofore established for his benefit at an expense to the government of about $3,000. He states that he was endeavoring to build up a trade on the A. L. Brown farm products as produced on his farm, and that in 1917 he bought about 25 per cent. of the animals put through the packing house; that this outside buying was brought about by the demand from the army cantonment. The government demanded his products in large quantities, and he had to procure it elsewhere. At the beginning of 1917 he had on the farm about 600 head of cattle, about 2,000 hogs, and 8,000 or 9,000 poultry. He sold at auction about 100 head of stock, slaughtered 101 beeves, 1,300 hogs, 117 veal, and about 40,000 poultry, of which he bought one beef, 350 or 400 hogs, and about two-thirds of the poultry.

"The alleged bankrupt kept no books of account or other records to show the operations of the farming, except that the moneys borrowed from the Amos Brown estate were kept in the books of that estate, and except that on about the latter part of 1916 or the beginning of 1917 the alleged bankrupt, A. L. Brown, inaugurated an elaborate system of bookkeeping, for the purpose, as he states, of keeping track of the different industries on the farm, to show which was making money and which was losing, and the relative advantages of the several departments, but that said books do not show, and were not intended to show, anything except the operations of the farm and the operations of the several plants or industries thereon. In other words, the books do not show the financial condition of the farming industries. Mr. Hill, who testifies as an expert and as having made an examination of the books, shows that the gross income from the farm and its several industries amounted to about $222,000 from all sources, and the gross income from the farm at about $95,000, and in that connection witness Hill states that the feed bought amounted to $37,648, and the feed raised on the farm was $17,600; that the cost of operating the farm was about $22,000, and the gross expense of operation $250,000, and that the total labor cost was $46,391, of which the farm labor cost was $16,000; and he further shows that the hogs produced a gross amount of $32,000, of which $12,000 was bought from the outside, and that they bought poultry to the amount of $19,900, and raised poultry to the amount of $5,500, and about $3,000 worth of cream, all in the year 1917. Further testifying, Mr. Hill gave a summary, stating that the finished product sold amounted to $121,158 during the year 1917, and that the moneys spent were as follows:

| | |
|---|---|
| Labor | $46,000 |
| Feed | 37,000 |
| Hogs | 12,000 |
| Cream | 2,900 |
| Power | 3,800 |
| Shipping | 2,900 |
| Improvements | 28,000 |
| Interest | 7,350 |

"This makes a total of $129,950. Mr. Hill further states that on the 1st of January, 1918, the alleged bankrupt, A. L. Brown, was owing a total of more than $1,000,000, and on reference to the books he testified that the accounts payable, as shown on the ledger, indicated $49,258. Mr. Hill, when recalled, testified that of the stuff that passed through the packing house, about $39,200 worth, there was $27,000 worth raised on the farm, and the balance, about $17,000 worth, purchased, and that there was about $6,000 worth of stuff on hand, as per inventory at the beginning of the year, and estimates that the percentage of the stuff bought for the packing house was from 38 per cent. to 40 per cent. of the products passing through the packing house.

"Referring to witness Hill's testimony, the witness refers to the loss on the place during the year 1917, and states that the dairy lost $13,700, the horses lost $3,309, the poultry lost $2,900, the battery lost $1,900, and the packing house lost $4,084, making a total loss on operations of approximately $21,000. So far as the record shows, the operation of the farm, with all of its industries, for the year 1917, was run at a loss, and there is nothing to indicate that at any time it made a profit. The operation of the creamery and the packing house at least were subject to the state industrial insurance law, and, at the solicitation of the alleged bankrupt, a government inspector was put into the packing house to furnish inspection of its products, so that the alleged bankrupt might enter his products in the market, and which entitled him to put his goods on the market anywhere in the United States and Canada.

"It is strenuously contended by the petitioning creditors and interveners that this A. L. Brown farm is a manufacturing plant, and that the farm down there is incidental, and not the chief industry, but that the creamery, packing house, and poultry establishment constitute the chief industry or business of the alleged bankrupt; while, on the other hand, the alleged bankrupt and the answering creditor, Dexter-Horton National Bank, as strenuously contend that it is all comprehended within the term 'farming,' and that the whole plant is a farm and the operations thereon farming. Curiously enough, each side in this matter cite in their arguments the same cases to support their contentions. This question is a question of fact as to whether or not the bankrupt was a farmer chiefly, or something else. Collier on Bankruptcy, under this heading, claims that the words or terms 'farming' and 'tillage of the soil' are not synonymous, or one a definition of the other. In Bank of Dearborn v. Matney, in the District Court for the Western District of Missouri (12 Am. Bankruptcy Repts. 482, 132 Fed. 75), Judge Phillips takes the same view, and holds that the word 'farming' is more comprehensive than the words 'tillage of the soil,' but, in a later case from the Circuit Court of Appeals, Eighth Circuit, in Hart-Parr Co. v. Adam Barkley et al., 36 Am. Bankruptcy Reports, 540, 231 Fed. 913 [146 C. C. A. 109], the court holds that the words 'farming' and 'tillage of the soil,' as used in section 4b of the Bankruptcy Act [Act July 1, 1898, c. 541, 30 Stat. 547 (Comp. St. 1916, § 9588)], express the same thought; that is, the word 'farming' and the words 'tillage of the soil' mean the same thing. If, in law, the two terms are identical, I take it that the word 'farming' is limited to the scope of the term 'tillage of the soil,' and I would take the term 'tillage of the soil' to comprehend the production of crops, including the production of fat stock, or any kind of stock on a farm; but it does not occur to me that it would extend to the operations carried on upon the A. L. Brown farm, in the creamery, the packing house, and the poultry department. The poultry department was not conducted as the growing and selling of poultry, but it was, during the year 1917, used in the fattening and marketing of the poultry. The most of the poultry that was used was bought, most of the feed that was fed to it was purchased, and it was dressed and marketed. A large portion of it was produced on the farm, but a major portion of it was bought from the surrounding country.

"It seems that the income from the farm and all these industries came through these institutions; nothing of any consequence was sold direct from the farm; but most everything was put through one of these institutions and marketed. The alleged bankrupt spoke of his farm as a plant, and seemed to look to his plant as a thing independent of his farm as an indus-

try, and in his system of books and accounts treated each one separately, and charged the products that went from the one to the other back and forth, and has shown by his letter to his creditors and to his assignees (Exhibit F) that he regarded it as a manufacturing plant, and believed that by reorganization, with the assistance of his creditors, that he could make it pay out the indebtedness, showing that he regarded it as a manufacturing plant and his chief industry. He was in the market to market a finished product, most of which, however, was produced on his farm, though manufactured and prepared for market in his creamery, packing house, or poultry establishment. Marketing a finished product from the farm is not inconsistent with farming or tillage of the soil, but in this instance it seems to me that the line is crossed from chiefly farming when the production reaches the packing house in this case. There it was necessary to do and have all of the things, appliances, and conveniences that an ordinary packing house has, including a government inspector, to enable him to get into the market first-hand, and he seems to have borrowed all of the money to construct this packing house and equip it, to enable him to so enter the market. In that he came in competition with other packing establishments.

"However, I think the major part of his business was in the management of the Amos Brown estate, of which he was the president, and in which he owned a one-eighth interest, an estate estimated of the value of about $2,000.000. Through that estate, and individually, he borrowed large sums of money. While he says that he spent but little time in that matter, yet it seems to me that it required an exercise of much thought and attention, in order to handle the financial transactions of that scope. This estate he handled, and controlled and contributed much of his time to, up to about the time of the assignment which is charged here as an act of bankruptcy, and from which he derived a salary of $3,000 a year, which was paid to him up to about three years ago, and which appears to have been credited to his account since then by the estate. He borrowed large sums of money from this estate, and which caused the Amos Brown estate to be put into the hands of a receiver about the time of the said assignment, and his assignees are, as I understand it, the receivers of the Amos Brown estate, and that the receivership was made necessary by the large sums of money due from the alleged bankrupt to the Amos Brown estate. The indebtedness incurred by the alleged bankrupt has not been due to or made necessary by his farming operations, although the farming, so far as the record shows, has never been successful, but that the indebtedness has been incurred in the improvements and buying of stock, the erection and operation of his plant, as he calls it, the dairy and creamery, the packing house, the poultry department, and in the interest of the Amos Brown estate.

"Taking this case all together, I am of opinion that it does not fall within the term 'principally engaged in farming or tillage of the soil.' While this farm is a large farm, and produces a large quantity of feed for stock and supports a large quantity of stock, yet the chief business actually carried on upon the farm is converting products of the farm into the manufactured article ready for the retail trade, and not only that, but coupled with his activities in the management of the Amos Brown estate and other matters, the alleged bankrupt is not entitled to the exemption accredited to one 'engaged chiefly in farming or tillage of the soil.' "

Specific exceptions have been taken to a number of the matters stated by the master in the foregoing report. While in part these objections may be well taken, yet upon the whole testimony the controlling finding that the bankrupts were not engaged chiefly in farming or the tillage of the soil appears amply supported. The farm mentioned is about 50 miles from Seattle. The packing house plant, creamery, dairy, and poultry plant, which latter appears to include, not only the raising of poultry, but the fattening, killing, and the final preparation of the dressed poultry for market, were all located upon the farm.

Leaving out of account the alleged bankrupt A. L. Brown's statements and admissions, including that in the circular letter to the creditors, that for a long time he had bought from the outside about 95 per cent. of the farm products sold, and assuming, without finding, that the master was wrong in determining that the larger part of the bankrupt's business was in the management of the Amos Brown estate, and looking solely at the operations conducted on the farm at Nisqually, the master's finding is the only one that can be reached upon the testimony.

[1, 2] Stock raising and dairying, in connection with and incidental to tillage of the soil, are in common parlance a part of farming. Therefore the word "farming" is broader than "tillage of the soil." In so far as the Bankruptcy Act is concerned, the dairying and the stock and poultry raising, slaughtering, and preparing for market can only be incidental to the "tillage of the soil," in order to be included in the expression "farming."

While many things are properly to be considered in determining the question of the business in which the alleged bankrupts were engaged, and that in which they were chiefly engaged, yet a fair measure and index of the operations at Nisqually and their relative importance, presumably in close proportion to the time, attention, and effort required, is afforded by the master's finding as to the stock and feed raised on the farm as compared with that bought outside, the cost of the labor employed in the tillage and that of the packing plant, creamery, dairy, and poultry plant. This statement and finding of the master, which is strictly in accordance with the evidence and covers the year 1917, is as follows:

"Mr. Hill, who testifies as an expert and as having made an examination of the books, shows that the gross income from the farm and its several industries amounted to about $222,000 from all sources, and the gross income from the farm at about $95,900, and in that connection witness Hill states that the feed bought amounted to $37,648, and the feed raised on the farm was $17,600; that the cost of operating the farm was about $22,000, and the gross expense of operation $250,000, and that the total labor cost was $46,391, of which the farm labor cost was $16,000; and he further shows that the hogs produced a gross amount of $32,000, of which $12,000 was bought from the outside, and that they bought poultry to the amount of $19,900, and raised poultry to the amount of $5,500, and about $3,000 worth of cream, all in the year 1917."

This clearly and concisely shows that the tillage of the soil was incidental and subordinate to the other operations conducted by the alleged bankrupts at their farm.

The report of the master will be confirmed. The exceptions are overruled and denied.