**In re John H. MARTIN, Peggy Martin, Debtors.**

**Bankruptcy No. 86–20742.**

United States Bankruptcy Court, D. Montana.

May 11, 1987.

See also, Bkrtcy., 78 B.R. 598.

J. David Penwell, Bozeman, Mont., for debtors.

Doug James, Billings, Mont., for John Deere.

Ralph B. Kirscher, Missoula, Mont., for Sherick.

James M. Kommers, Bozeman, Mont., for First Sec. Bank of Bozeman.

Douglas Harris, Bozeman, Mont., for Dorn Equipment Co.

Lee Stokes, Bozeman, Mont., for New Holland Inc. a/k/a Sperry New Holland.

J. Richard Orizotti, Butte, Mont., for J.I. Case Credit Corp.

Richard C. Nellen, Bozeman, Mont., for First Sec. Bank of Idaho.

Dunlap and Caughlan, Butte, Mont., Trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

Hearing on the Debtors' Amended Chapter 12 Plan was held on April 2 and 10, 1987, together with objections filed by the Trustee, John Deere Company, First Security Bank of Bozeman, Duetz-Allis Credit Corporation, New Holland, Inc., a/k/a Sperry New Holland, Rudolph M. and Sarah Sherick, J.I. Case Credit Corporation, Dorn Equipment Company and First Security Bank of Idaho, which creditor also requested relief from the automatic stay. First Security Bank of Livingston originally filed objections to the Plan, but has now reached an accord with the Debtors and has withdrawn its objections. One of the objections filed by the Trustee and certain creditors is that the Debtors are not eligible for Chapter 12 relief since their operation does not meet the definition of family farmer under 11 U.S.C. § 101(17) and (20). Due to the present posture of this proceeding which is explained in this opinion, it is only necessary to address two aspects of the case, one dealing with the status of the Debtors as family farmers, and the other, with the feasibility of the Plan.

The case was filed December 11, 1986. In order to qualify as family farmers under Chapter 12, the Debtors' income from farming operations must exceed 50% of the Debtors' gross income "for the taxable year preceding the taxable year in which the case * * * was filed". § 101(17). Thus, the gross income earned by the Debtors in 1985 is the relevant year to examine whether the Debtors meet the income test. According to the 1985 tax returns, Schedule F, the Debtors derived income from three separate sources, to-wit:

| | | |
|---|---|---|
| 1. Park County cattle operation | – | $25,023.00 |
| 2. Custom combine of grain | – | 31,854.00 |
| 3. Custom hay cutting and sales | – | 62,526.00 |

The objecting creditors contend that the custom combining of grain and hay is not a farm related operation, but constitutes a business or commercial enterprise, while the Debtors' contend all of their income is derived from raising of livestock, haying on a share crop basis and combining of grains for third parties. Indeed, the Chapter 12 plan shows the major portion of projected income to fund the Plan will come from haying and custom grain cutting. The creditors rely on case authorities of *First National Bank v. Beach*, 301 U.S. 435, 57 S.Ct. 801, 81 L.Ed. 1206 (1937); *In re Middleton*, 45 B.R. 744 (Bankr.Minn.1985); *In re Tuxhorn*, 231 F. 913 (8th Cir.1916); *King v. Ohio Valley Trust Company*, 286 F. 928 (6th Cir.1923); and *In re Schoenburg*, 279 F.2d 806 (5th Cir.1960). All of these cases except *Middleton* pre-date the 1978 Bankruptcy Code amendments, and the present definition of farming operation. Thus, they have little precedential value, except for some historical treatment of who may be a farmer. The Debtors do not fare much better, relying on cases such as *In re Schwartz*, 133 F.2d 216 (7th Cir.1943); *In re Nicholson*, 36 F.Supp. 308 (D.S.C. 1940); *In re Beachwood*, 42 F.Supp. 401 (D.N.J.1942); *In re Hinrichs*, 314 F.2d 384 (7th Cir.1963); *Matter of Beery*, 680 F.2d 705 (10th Cir.1982) [a pre-Code case interpreting 11 U.S.C. § 1(17) (1976)] and *Smith v. White*, 166 F.2d 269 (9th Cir. 1948).

The creditors concede that the income derived from the Debtors' livestock operation on their farm of 40 acres is farm related income. They dispute the remaining two items for haying and custom cutting of grain are farm related. The undisputed testimony is that the Debtors' hay production comes from share cropping, in which he cuts hay raised on other lands on a 50/50 share arrangement. In 1985, 300 tons of cut hay was used to feed the Debtors' cattle, and the other 7000 tons were sold on the open market. In the custom grain cutting operation, the Debtors own three combines which they use to cut grain raised on third party farm lands and are paid on a per acre basis. Both the haying and custom cutting operations constitute the final stage of production of growing crops.

Section 101(20) provides:

"Farming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry or livestock, and production of poultry or livestock products in an unmanufactured state;"

The definition is not inclusive, but is rather representative of types of farming. Case law interpreting and applying Section 101(20), formerly 101(18), include *In re Blanton Smith Corp.*, 7 B.R. 410 (Bankr. M.D.Tenn.1980), which gives a historical and legislative history of the Code provision; *In re Cattle Complex Corp.*, 54 B.R. 50 (Bankr.N.M.1985) (feedlot operator is a farmer); *In re Dakota Lay'd Eggs*, 57 B.R. 648 (Bankr.N.D.1986); and *Matter of Armstrong*, 812 F.2d 1024 (7th Cir.1987), aff'd and rev'd *Armstrong v. Corn Belt Bank*, 55 B.R. 755 (C.D.Ill.1985). In order to digest the approach taken by the courts as to who is or is not a farmer, certain representative quotes from the above cases give clear insight into the determination and holding in this case where I conclude the debtors qualify as family farmers under Chapter 12.

Section 101(20), formerly 101(18), was discussed at length in the case of *In re Dakota Lay'd Eggs*, 57 B.R. at 653, where the court states after discussing *In re Blanton Smith Corp.*, supra:

" * * * Tracking the legislative history of 101(17) and (18)[20], as well as the definition of 'person' found in Section 101(33), the Bankruptcy Court in *Blanton Smith* concluded that the term 'farmer' could no longer be confined to small farms but rather must include in its definition farming corporations and agri business. With that conclusion, this Bankruptcy Court agrees. The *Blanton Smith* case, however, did not address the issue from the standpoint of income or production sources. It did not attempt to distinguish between debtor-owned or operated farming operations and non-

owned or non-operated farming operations. * * *

\* \* \* \* \* \*

In construing Section 101(18)[20], several things must be kept in mind. First, Section 101(18) is a helper. Its placement in the Code is intended to aid in defining who qualifies as a 'farmer' under Section 101(17). Secondly, although Section 101(18) may by its terms be regarded as non-exclusive with regards to the types of farming operations which may be included within the definition, it cannot be so broadly applied as to bring in operations clearly outside the nature or practices one normally associates with farming. * * * Section 101(18) suggests that the term 'farming operation' was meant to include those estimates normally done by persons engaged in the initial stages of production."

The North Dakota court cited *Armstrong v. Corn Belt Bank (Matter of Armstrong)*, 55 B.R. 755, as a recent bankruptcy decision which holds that farming operations within the context of 101(18)[20] requires a distinction be made between the nature or character of the income sources to arrive at a determination of what constitutes a "farming operation". In *Armstrong,* the court found income from the sale of farm machinery and rental of farm land was not derived from a farming operation.[1]

The holding of the district court regarding the farm machinery income was reversed on appeal in *Matter of Armstrong,* 812 F.2d 1024, 1026–27 (7th Cir.1987), where the Court held in discussing 101(18):

"The definition does not provide a simple all-inclusive list of tasks and activities (i.e., tillage of the soil, dairy farming). Instead, the section starts out in general terms—'Farming operation includes *farming,* tillage of the soil, dairy farming ...' (emphasis added). Implicit in this definition is the inclusion of general activities inherent in farming and, we believe, the means (or in this case the

equipment) necessary to perpetuate the farming operation the definition speaks of. When a farmer sells some of his machinery in an effort to scale down his operation (say from 200–100 acres) and save the farm, the money received is inescapably from the 50% of the farming operation dissolved. We believe this to be a pragmatic viewpoint. A contrary result would reap illogical results which we are confident Congress had no desire to create. Farmers in financial trouble could harvest their crop on a given year, decide to scale down their operation, sell machinery and be considered non-farmers under § 101(17) even though they had no significant outside employment or income. Suppose Armstrong had no income from farming rent or the seed company. After all, many legitimate farmers do not rent land or receive wages from outside companies. Given this scenario Armstrong could have made money solely from the sale of beans and corn (and inconsequential income from elsewhere) and yet still have been considered a non-farmer. This result is illogical, undesired and unnecessary. One envisions large numbers of cases where farmers, by merely pruning their operations and selling their equipment, are no longer considered farmers for purposes of the bankruptcy code. We do not believe Congress envisioned such a scenario and believe a broader interpretation is necessary.

Farmers are exempted from the commencement of involuntary cases under Title 11 '... because of the cyclical nature of their business. One drought year or one year of low prices, as a result of which a farmer is temporarily unable to pay his creditors, should not subject him to involuntary bankruptcy.' See Senate Report No. 95–989, U.S.Code Cong. & Admin.News 1978, p. 5787 as found in the Historical & Revision Notes of Title 11. *This rationale is steeped in the concept of risk; farmers are caught in*

---

**1.** The district court in *Armstrong* did hold that under the Code a person need not personally till the soil to be a farmer; his income, however, must have some connection with the inherently

speculative nature of farm income caused by the ravages of climate and fluctuating farm prices. *Id.* at 760–61.

*..a risk-ridden enterprise. To say that the implements which are necessary to perpetuate the enterprise are not part of the enterprise is not logical,* especially when, as in the instant case, the implements are sold to keep the enterprise, in its failed form, afloat. We may have reached a different result if the record had revealed that Armstrong had a history of buying and selling equipment on an experimental basis or for investment purposes. However, the record in this case inescapably points to the fact that the sale in this case was, '... a sale of a portion of the equipment of a person in financial trouble.' See Bankruptcy Court Opinion and Order of December 1, 1982, page 4. The record reveals the equipment was a necessity for the farming operation, not a detached investment distinct from the farm. Hence, we conclude it was part of Armstrong's 'farming' within the meaning of the definition of 'farming operation' found at § 101(18)." (Emphasis supplied).

In *Dakota Lay'd Eggs*, the court did conclude that income from eggs obtained through contracts with independent producers who owned the hens was not farming income.

■ I see a significant difference in this case, particularly as to the hay operation, which is conducted on a 50/50 share crop basis. In essence, while the hay is grown on another's land, the Debtor has a 50% ownership interest in the hay and he is at risk to the vagaries of the weather and market price as is the other 50% owner. Such joint venture calls for one party to cultivate and grow the hay and the other party (Debtor) to cut and market the crop. The Debtors, in this instance, are conducting a farming operation squarely within the definition of 101(20), which is the "production" of crops. As stated in *Dakota Lay'd Eggs*, supra, at 656:

"Is it a typical farming activity and, if so, whose farming activity is it—DCI (debtor) or someone elses?"

It would come as quite a shock to a lot of farmers in this country to now learn as contended by the Bank, that share cropping is not a typical farming activity. The position of this holding is further buttressed by the fact that the Debtors cannot produce enough hay on their acreage to sustain their Simmental breed and thus, they turn to a share crop arrangement to sustain that cattle operation. I, therefore, hold that all income derived from the hay cutting operation is part of the Debtors' farming operation. Thus, when combined with the sales of cattle, the total income from these two sources exceed 50% of the total gross income of the Debtors. By reason of this holding, it is not necessary to consider the Debtors' third component of their integrated operation, i.e., custom combining of grain, since the fifty per cent test is already satisfied. If a decision were necessary however, I would hold under the present facts, that custom cutting of grain is part of these Debtors' operations, and therefore a farming operation because the harvesting of grain is just as essential to a successful operation of the Debtors' whole farming operation as share cropping of hay. I do not believe it is consistent with Congressional policy, which broadened the definition of family farmer in the 1978 Code, and which desires to allow farmers a new form of debtor relief under Chapter 12, to apply strict, technical piece-by-piece approach to a fully integrated farm operation so as to defeat the debtor's right to relief. After all is said and done, the Debtors here still rely 100% on traditional farm methods of production to earn their livelihood. They are family farmers.

In order to confirm a Chapter 12 Plan, Section 1225(a)(6) requires the debtor "will be able to make all payments under the plan and to comply with the plan". This provision is known as the feasibility test. The issue as to whether the Plan is feasible is tied directly to the testimony of the Debtor John Martin. By way of background to that testimony, the record shows that in November, 1986, two secured creditors repossessed equipment of the Debtors, and still hold a major portion of that equipment. Martin commenced a state court proceeding seeking return of the equipment, but that case was aborted, or placed

on hold, when Martins filed their Chapter 12 proceeding on December 11, 1986. Rather than immediately proceed in this court for a turn-over order on the equipment, Martin waited until March 31, 1987, to seek judicial relief by filing a pleading called "Motion For Judicial Relief and Determination of Jurisdiction". Part of that 18 page document recited that the first matter which must be addressed and which has the highest priority is to accomplish return of the equipment in order for the Debtors to feed their cattle and secure haying contracts for the summer of 1987. Martin acknowledged in his own testimony on the confirmation of the Plan that if he did not have the equipment returned to him, his Plan was worthless, and it could not succeed. This Court, on April 3, 1987, called the Debtors attention to the fact that the procedure utilized by the March 31st motion was not proper, because under Rule 7001, Bankruptcy Rules, an adversary complaint is necessary for the turnover of property of the estate. On April 16, 1987, the Debtors filed such complaint against First Security Bank of Bozeman, Dorn Equipment Company and Sperry New Holland Credit Corporation seeking, in part, under Count Three, an order of turnover of unspecified equipment "to enable them [Debtors] to initiate, carry out and complete their Chapter 12 Plan". Debtors further alleged that "without the turnover or return of said equipment to them, the Plaintiffs would be helpless to continue in business and certainly would have no hope of implementing or carrying out their Chapter 12 Plan of operation and require the machinery and equipment in order to stay in business and make payments called for under said Plan". Debtors concede the Defendant creditors still have possession of the equipment. Why the Debtors delayed in seeking turnover until over four months after the filing of this case, when their summer contracts are on the line is unexplained. Moreover, the Debtors have filed no motion for expedited service of process or order to show cause to accelerate a decision on the turnover request.

█ The obvious problem presented by the Debtors' actions is that the Plan cannot be confirmed until a showing of feasibility is made to the Court. On this issue the Debtors have the burden of proof. *In re Martin*, 66 B.R. 921 (Bankr.Mont.1986). Further, a chapter case, whether it be Chapter 11, 12 or 13, is not to be used as a litigating tactic. *In re Reilly*, 71 B.R. 132, 135, 4 Mont.Bkr.R. 150, 156 (Bankr.Mont. 1987), holds:

> "It is not the purpose of a Chapter 11 Plan to be used as a litigating tactic. *In re Block K Associates*, 55 B.R. 630, 634 (Bankr.Colo.1985); *In re Wally Findlay Galleries (New York) Inc.*, 36 B.R. 849 (Bankr.S.D.N.Y.1984)."

In sum, confirmation of the Plan binding the several creditors who are now named as defendants in the adversary action does not reach the turn-over of the property. The Plan, as of this date, is not feasible, and therefore cannot be confirmed until resolution of the turnover action.

IT IS ORDERED that final order of confirmation is stayed pending resolution of Adversary Proceeding No. 287/0022.