### In re DISNEY et al.

(District Court, D. Maryland. January 6, 1915.)

1. BANKRUPTCY ⬿68—PERSONS SUBJECT TO BANKRUPTCY—PERSONS CHIEFLY ENGAGED IN FARMING.

Whether a debtor was chiefly engaged in farming, and therefore exempt from involuntary bankruptcy adjudication, is to be determined as of the time when he committed the act of bankruptcy charged against him.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ⬿68.]

2. BANKRUPTCY ⬿68—BUSINESS OCCUPATION.

A man who regularly follows two occupations is not at the time of the commission of an act of bankruptcy chiefly engaged in one of them merely because at that time he is giving his principal attention to it rather than to his other pursuit.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ⬿68.]

3. BANKRUPTCY ⬿68—ADJUDICATION—OCCUPATION—FARMING.

Evidence *held* to require a finding that a bankrupt firm, operating a canning factory and canning produce partially raised on their farm, was not chiefly engaged in farming, nor were the members of the firm, except one, so chiefly engaged, and hence the firm and the partners, with such exception, were subject to bankruptcy adjudication.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 18, 86, 87; Dec. Dig. ⬿68.]

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Bankruptcy. Involuntary bankruptcy proceedings against John W. Disney, Jr., and others, trading as J. W. Disney & Sons, and John W. Disney, Jr., and others, individually. Adjudication granted against the firm and the individual partners, with the exception of Arthur A. Downs.

William Stanley, John M. Requardt, and Ogle Marbury, all of Baltimore, Md., for petitioning creditors.

Ridgely P. Melvin and James M. Munroe, both of Annapolis, Md., for J. W. Disney & Sons, John W. Disney, Jr., and James F. Disney.

L. Vernon Miller and George Weems Williams, both of Baltimore, Md., for Arthur A. Downs.

ROSE, District Judge. John W. and James F. Disney are brothers. They have always lived together upon a farm in Anne Arundel county. During all their adult life they have been engaged in farming. For many years they have carried on their agricultural operations as partners under the firm name of J. W. Disney & Sons. Each of them as individuals owned some of the land cultivated by the partnership, while the rest belonged to the firm. They estimate that the gross annual value of the crops sold by them varied from $13,000 to $20,000. These figures, in view of the tillable acreage employed, seem large, and probably are liberal; but as they were principally engaged in the production of fruits and vegetables, the value of their output and the cost of raising and marketing it were both high. In winter time, for the purpose of affording employment for their farm hands, they cut and dealt in cordwood. It was a small business. They estimate that it brought in not more than about $500 a year. In 1908 they decided to go into canning. They erected a canning factory on their place, and equipped it at a cost of some $8,000. In the years from 1909 to 1913, both inclusive, they annually put up and sold somewhere between $20,000 and $30,000 of canned goods. A considerable portion of the fruits and vegetables canned by them were raised on their places, but from a half to two-thirds were purchased from other people.

From a financial standpoint their canning venture was not successful. They lost money by it. In 1912, and in some preceding years, they purchased their cans from one of the petitioning creditors. They have not yet paid for them. In the fall of 1913 they sought a renewal of the notes they had given for these cans. At that time the creditor advised them not to re-engage in the canning business. Perhaps the Disneys supposed that this advice was in part inspired by the fact that they had purchased their 1913 cans elsewhere. At all events they appear to have decided not to follow it.

In July, 1914, they made arrangements with the Southern Can Company, from whom in the preceding year they had obtained their cans, to supply their requirements for the packing season of 1914. Early in August, in accordance with their direction it shipped them a car load of cans. About the same time they purchased solder and coal. The war in Europe had then broken out. Crop prospects on their places and in their neighborhood were poor. Their financial difficulties were

fast coming to a head. They changed their minds, and determined not to do any canning that year. They asked the Southern Can Company to take back its cans. It did so. In a similar fashion they disposed of their coal and their solder.

Arthur A. Downs is a neighbor and friend of theirs. He has also been farming all his life. In July, 1912, he and the Disneys entered into an agreement by which he was to be a partner in the canning business carried on by them. The style of the firm was to remain unchanged. They were to contribute the canning house and other buildings, and he was to put in $2,000. He was to have one-third of the profits and to bear one-third of the losses. At the end of the season he had the option of withdrawing his $2,000, if he wished. He was introduced to many persons having dealings with the firm as one of its partners. He never put in $2,000 of his own money; but, together with the Disneys, he either signed or indorsed notes to the extent of $9,500, most of the proceeds of which went into the canning business, although some of it may have been expended on the Disney farms. There were no profits in 1912, and he received none. There were losses; but, except in so far as the notes upon which he became liable helped to defray them, they have not been paid by him, if they have been paid at all. Neither he nor anybody else ever gave any notice to the creditors of the firm or other persons dealing with it that he had retired from it. As late as the summer of 1914 he on some occasions at least acted in such a way as would naturally lead persons who knew he had once been a partner to suppose he still was. When examined as a witness in this case, he seemed to be very uncertain in his own mind whether he was or was not a partner, and whether, if there had been any profits in 1914, he would or would not have been entitled to share in them. Many of the debts, contracted when he was a partner, are still unpaid. The partnership of which he was once a member is, therefore, still subject to adjudication in bankruptcy. Bankr. Act July 1, 1898, c. 541, § 5a, 30 Stat. 547 (Comp. St. 1913, § 9589).

During August, 1914, Downs and the Disneys, together with some of their relatives, gave two judgment notes to the Farmers' National Bank of Annapolis, one for $8,000, and one for $1,500. On the 6th of that month the bank caused a confessed judgment to be entered on the larger note, and on the 19th on the smaller, for a sum aggregating, with attorney's fees and costs, $9,709.50. At various other dates during the same month it and the Annapolis Banking & Trust Company obtained like judgments upon similar notes against the Disneys, but not against Downs, for the aggregate sum of $2,158.60. Almost all of the property of the debtors was in the form of real estate, upon which these judgments at once became liens. On the 30th of October, 1914, Downs made a general assignment for the benefit of his creditors, and on the 11th of November the Disneys did the like.

On the 5th of December the John Boyle Company, which had sold them cans in 1912, the Simpson & Doeller Company, from which they had purchased labels in 1913, the Patuxent Bank of Laurel, and the

Citizens' National Bank of the same place, which had lent them mon·ey, as the banks understood, for their canning operations, filed a petition to have them adjudicated involuntary bankrupts. They owe the petitioning creditors some $11,500. The indebtedness of the firm due to other persons than the judgment creditors already mentioned, or to those uniting in the petition, amounts to some $7,000 or $8,000 more, so that the partnership owes in all about $30,000. Practically all of this indebtedness was contracted in the course of the canning business. It is not likely that as farmers they either would have sought or could have secured so extensive a line of credit. They resist adjudication on the ground that they are principally engaged in farming.

The substantial contest is, of course, not between them and the petitioning creditors, but between the latter and those who were fortunate enough to obtain judgments. All or nearly all the money or money's worth that came from either set went into the canning business. If they are not adjudged bankrupts, the holders of judgments will get somewhere between 75 and 100 cents on the dollar, and the other creditors nothing. It does not appear that the debtors have even any sentimental interest in choosing among their creditors, for none of their relatives or associates are among those who have obtained judgments.

It may be safely assumed that Congress had no wish to facilitate preferences among a farmer's banking or mercantile creditors. There were in its judgment, however, reasons which in the overwhelming majority of cases made it inexpedient that farmers be subject to the possibility of involuntary bankruptcy, although, of course, there would be instances in which the denial to creditors of the right to institute bankruptcy proceedings against a farmer would work grave injustice to them and be of no benefit to him. Weighing one consideration against another, Congress made up its mind that the maximum of practically obtainable good with the minimum of preventable evil would be done by exempting from liability to involuntary bankruptcy all those who were more farmers than they were anything or all things else. It gave statutory embodiment to this conviction by declaring that "a person engaged chiefly in farming or the tillage of the soil" may not be made an involuntary bankrupt. Bankr. Act, § 4a.

[1] The fact that a particular farmer will not suffer if he be adjudicated, and many of his creditors will if he be not, is therefore no reason for construing the exemption narrowly. Nor does the probability or reverse of such an outcome give even in a close case much help in determining whether a debtor was or was not chiefly engaged in farming. It is settled, at least in this circuit, that whether a debtor was or was not chiefly engaged in farming is to be determined as of the time at which he committed the act of bankruptcy charged against him. Counts v. Columbus Buggy Co., 210 Fed. 748, 127 C. C. A. 298; Flickinger v. First Nat. Bank of Vandalia, 145 Fed. 162, 76 C. C. A. 132.

For the defendants, it is contended that they had definitely retired from the canning business some months before they made the assignments here complained of. The evidence does not justify the conten-

tion that they had gone out of it, or that they thought they had, at any time before they made up their minds to execute those assignments which put an end to their farming and to their wood-cutting, as well as to their canning. As late as July or early August they expected to operate their cannery in the season of 1914. When circumstances prevented their doing so, it does not appear that they supposed they would not resume again in 1915. They were on the stand, and I am convinced that in August they did not think their cessation of canning was anything other than temporary. Hard pressed as they were for money, they made no attempt to dispose of their valuable canning machinery. Indeed, it is obvious that such an idea never occurred to them. When and immediately before they made their assignments, they were still engaged in canning in the same sense as they had been at any time at which their cannery was not actually in operation.

[2] Defendants say that, even conceding so much for the sake of argument, yet it nevertheless does not make any difference what they did from 1909 to 1913, or what they prepared to do in 1914, or what they hoped to do in 1915. It is a fact that the canning season of 1913 closed in October of that year, and that they then shut down their cannery. They shortly after shipped its product to Baltimore. Most of it was sold, and the rest was put into a public warehouse and pledged as collateral for a loan which they negotiated. Thereafter their actual connection with the canning business was confined to occasional attempts through their broker to sell the pledged goods at a profit, to making preparations for the resumption of canning in 1914, and to securing further indulgence from those to whom they were indebted for money or merchandise which they had used in it. They point out that, no matter how liberal an allowance may be made for the time and effort expended in any of these ways, or in all of them together, farming was the larger part of all of their activities and pursuits during the 12 months immediately preceding the making of their assignments. They rely upon Counts v. Columbus Buggy Co., supra, as conclusively determining that they are not subject to adjudication.

In that case the debtor had three occupations. He was a large farmer. The capital he had invested in that pursuit amounted to $40,000. The annual product of his farms at the prices then prevailing must have exceeded $20,000. For some 18 months preceding the filing of the petition in bankruptcy he had been a partner in a buggy business, which was conducted by his son, in the management of which he took no part, and from which he received no profits. Moreover, for some years he had given over January and February to the buying and selling of mules in partnership with one Cowan. He contributed no capital to this mule business. As between himself and his partner, he assumed none of its liabilities. He gave his services and received one-half of the profits therefor, which latter averaged $1,125 per annum. Upon this state of facts there was no doubt that for the four years, considered as a whole, his chief occupation had been farming, as it had been during each and every period of 12 consecutive months. The only time in which it could have been claimed that his principal pursuit was anything else was the 2 months of each year in which he

dealt in mules. Whether such claim could have been justified by the facts, or would have been material in law if it had been, the court had no occasion to consider; for, as it pointed out, the acts of bankruptcy alleged took place in the months of November and December. Concurring with the view of the Circuit Court of Appeals for the Sixth Circuit, as expressed in the Flickinger Case, supra, it held that whether a debtor belongs to an exempt class depends upon his status at the time of the commission of the act of bankruptcy charged against him. It was not material to inquire whether a man, who for a series of years regularly follows two occupations, has one status throughout the entire period, or has a periodically changing one, as from time to time his chief engagement is in one pursuit or in the other.

It is easy to conceive of a case in which a debtor regularly spent Monday, Tuesday, and Wednesday of each week in an exempt occupation, and Thursday, Friday, and Saturday in one which was not exempt. It would scarcely be contended that his liability to be adjudicated a bankrupt depended solely upon whether the act of bankruptcy charged against him was committed during the first half of some week or during the second. Like principles must control wherever a man has for a series of years regularly followed two occupations, one of which was his chief pursuit during one part of the year, and the other during the remainder. To determine whether he was chiefly engaged in farming, all his pursuits and activities for the entire 12 months would have to be considered. Of course it does not matter how long he has followed both such occupations. So soon as he definitely abandons one of them, it can no longer be claimed as one of his pursuits, much less the chief. Moreover, without abandoning either, the relative importance of one and the other may change, either suddenly or by almost imperceptible degrees. If such alteration appears from all the facts and circumstances to be permanent in its nature, and not merely such a fluctuation as naturally occurs in all business activities, his status may be altered by it. But whether he is subject to adjudication or not does not depend merely upon which of two occupations in which he was permanently engaged was his principal one on the day, or for the week or the month, or perhaps even for the year, in which the act of bankruptcy was committed. His status on that day, it is true, is decisive; but what was his then status is by no means determined by the particular things he did thereon. A man's domicile may change overnight, but he does not acquire a new one every time he sleeps away from home, and absence from the latter for years may not alter it. The analogy is, of course, not perfect, and if pressed too far may be misleading; but it serves to illustrate the distinctions which should be kept in mind in passing upon the class of cases now under consideration.

[3] The question for determination is, therefore: What was the occupation in which the debtors were chiefly engaged during the period from 1909 to the commission of what are charged as acts of bankruptcy? The affairs and occupations of men are of infinite complexity. It is not possible to lay down any precise rule which will in every case enable a court to say with certainty in what occupation a man has

been chiefly engaged. It is not permissible to segregate certain facts or circumstances, and say that their existence or nonexistence settles the question. In answering it, all "his activities and pursuits must be considered as a whole." American Agricultural Chemical Co. v. Brinkley, 194 Fed. 411, 114 C. C. A. 373.

The relative amounts of time which a man devotes to various lines of endeavor in which he is interested is doubtless one circumstance to be taken into account. In the case at bar there is no question that the defendants spent more time in their farming than in their canning. That circumstance is, however, not necessarily decisive. Many men may use or waste the larger part of their working hours in looking after some enterprise which is of relatively little pecuniary importance to them or others. From the standpoint of the bankruptcy law, it would not be accurate to say that they were chiefly engaged in the prosecution of such a fad. The amount of the financial returns the debtor expects from his various enterprises is one factor to be considered in determining which is the pursuit in which he is chiefly engaged. In a leading case it was said:

"The chief occupation or business of one, so far as worldly pursuits are concerned, is that which is of principal concern to him, of some permanency in its nature, and on which he chiefly relies for his livelihood, or as the means of acquiring wealth, great or small." In re Mackey (D. C.) 110 Fed. 355.

The exceeding complexity of the problem is illustrated by the fact that the word "relies," in the excellent definition just quoted, itself needs some construction. The defendants now before this court never made any net profits in the canning business. While they were engaged in it, they lived by their farming. Nevertheless they went into it in the not unreasonable expectation that it would prove their principal source of livelihood. Upon no other theory is it possible to explain the fact that they were willing to incur the obligations necessary to prosecute that business upon the scale upon which they undertook to carry it on. Practically all of their relatively large indebtedness was contracted in canning. That might be immaterial, had they definitely withdrawn from the canning business before they committed the act of bankruptcy charged against them. Flickinger v. First Nat. Bank of Vandalia, supra; In re Leland (D. C.) 185 Fed. 830; In re Folkstad (D. C.) 199 Fed. 363. It has already been found as a fact that they had not done so.

When a debtor follows two pursuits, the relative amounts of his indebtedness contracted in one and the other may be taken into account as an aid in determining in which he was chiefly engaged. Armstrong v. Fernandez, 208 U. S. 324, 28 Sup. Ct. 419, 52 L. Ed. 514; In re Mackey, supra; Bank of Dearborn v. Matney (D. C.) 132 Fed. 75; Tiffany v. La Plume Condensed Milk Co. (D. C.) 141 Fed. 444; In re Burgin (D. C.) 173 Fed. 726. By that test the defendants were canners, rather than farmers.

It is easy to point out that no one fact or set of facts is necessarily controlling. It is impossible to give any definite mathematical weight to any one of them, even in comparison with the others. In cases as close as this undoubtedly is, all that can be done is to keep all the circumstances in mind and decide according to the impression resulting.

No process of reasoning, no analysis of the evidence, will necessarily demonstrate that the determination arrived at is sound.

So far as the partnership and the Disneys are concerned, I have, after much hesitation, concluded that they were not chiefly engaged in farming. The extent of their operations as canners, as tested both by the annual output of their canning business and by the volume of the indebtedness incurred in it, seems to show that they made it their chief occupation and concern. Downs allowed himself to become nearly as deeply involved financially in the canning, enterprise as did the others. That result, however, appears to have been chiefly due to the influence the Disneys had over him and to the confidence he had in them. From the evidence it does not seem that he ever personally gave much time or thought to canning. I do not think he was chiefly engaged in it. He is therefore as an individual not liable to adjudication. The firm had three members. One of them was chiefly engaged in farming and could not be made a bankrupt against his will. The principal business of the other two and of the partnership as such was not farming. They have committed an act of bankruptcy and are subject to adjudication.

A partnership and some of its members may be against their consent adjudicated bankrupts, although others of the partners belong to the exempt classes. Dickas v. Barnes, 140 Fed. 850, 72 C. C. A. 261, 5 L. R. A. (N. S.) 654; Counts v. Columbus Buggy Co., supra. The recent criticism of the former case by the Circuit Court of Appeals for the Second Circuit (In re Samuels, 215 Fed. 845, 132 C. C. A. 187) has little application to the precise point here involved.

A decree may be prepared in accordance with the views herein expressed.