In re BROWN et al.

BROWN et al. v. W. H. KENWORTHY & SON et al.

(Circuit Court of Appeals, Ninth Circuit. October 14, 1918.)

No. 3173.

1. BANKRUPTCY ⟨⟩68—INVOLUNTARY PROCEEDINGS—OCCUPATION OF DEBTOR.

In determining whether an alleged bankrupt is chiefly engaged in farming, all his activities are to be taken into consideration, the relative amount of time devoted to each, and the comparative amount of revenue received and indebtedness incurred in each.

2. BANKRUPTCY ⟨⟩68—INVOLUNTARY PROCEEDINGS—OCCUPATION OF DEBTOR—"CHIEFLY ENGAGED IN FARMING."

An alleged bankrupt, who, although conducting a large farm, also built and operated a packing house, creamery, and poultry yards, buying live stock and poultry, and who contracted the larger part of his indebtedness in connection with business other than farming, held not chiefly engaged in farming.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Engage.]

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

In the matter of A. L. Brown and the community consisting of A. L. Brown and Emma Brown, his wife, alleged bankrupts; W. H. Kenworthy & Son and .others, petitioners. The alleged bankrupts and the Dexter Horton National Bank of Seattle appeal from an order of adjudication. Affirmed.

For opinion below, see 251 Fed. 365.

Herr, Bayley & Croson, of Seattle, Wash., for appellants ·Brown et al.

Peters & Powell, of Seattle, Wash., for appellant Dexter Horton Nat. Bank of Seattle.

Kerr & McCord, of Seattle, Wash., and Stephen V. Carey, of Spokane, Wash., for appellee National Bank of Commerce of Seattle.

Walter M. Harvey, of Tacoma, Wash., for petitioning creditors.

R. P. Oldham, of Seattle, Wash., for appellee Seattle Nat. Bank.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge. The question which this appeal presents is whether the court below erred in confirming the master's report and adjudging that the appellant A. L. Brown was not chiefly engaged in farming or the tillage of the soil on December 28, 1917, the date of the alleged act of bankruptcy, for which his creditors by their petition sought to have him adjudged bankrupt. Brown was a citizen of Seattle, a lawyer, and the president of the Amos Brown Estate, a corporation, in which he and his mother and sisters owned all the shares; the estate consisting of city property of the value of $2,350,000. As such president he received a salary of ·$3,000 per an-

num. He acquired 2,100 acres of land, situate about 60 miles from Seattle, and he and his wife had their home thereon, while at the same time they maintained apartments in Seattle, where much of their time was spent. The farm was stocked with a large number of cows, bulls, stallions, horses, swine, and poultry. Brown expended large sums of money in improving the farm. He erected thereon numerous buildings, including a stallion barn, an extensive packing house, with cold storage rooms, a creamery, and poultry houses. The packing house cost from $50,000 to $60,000, and the creamery and poultry houses about $30,000. Both the packing house and the creamery were of capacity vastly in excess of the needs of the farm. In 1915 he engaged in the business of selling his products directly to consumers by means of the parcels post. He secured the services of a government inspector for his packing plant. He slaughtered cattle and hogs, and, aside from beef, the manufactured product of the packing house included ham, bacon, sausage, and pickled pigs' feet. He bought cattle, hogs, and chickens from others to the extent of from 38 to 40 per cent. of the products which passed through the packing house. The evidence was that during the year 1917 the gross income from his several industries was about $222,000, of which about $95,000 was the gross income from the farm; that the feed purchased amounted to $37,648, while the feed raised on the farm was $17,600; that the gross expense of his operations was about $250,000, of which about $22,000 was the cost of operating the farm; that the total cost of labor was $46,391, of which the farm labor cost was $16,000. When obtaining a loan from a bank in July, 1917, Brown stated to the president of the bank that he was advertising a sale of his cattle, that he realized that in order to make money he must make it from his packing plant, and that he was making no money out of the stock, and for that reason he was going to dispose of it. On February 26, 1918, Brown wrote to his creditors as follows:

"In closing this letter I want to impress you with the fact that for the past several years I have been educating the farmers for many miles around in the raising and furnishing me with more and better products; I agreeing to take it all. They are now demanding that I still furnish them a market for their products. As a manufacturing plant I have been buying for a long time about 95 per cent. of the farm products we sold. We have daily calls for hundreds of dollars worth of Brown Farm Products, which we cannot furnish (no capital to purchase the raw products with)."

It is true that Brown testified that he did not mean by his letter that he had been buying 95 per cent. of the farm products which he sold, but that he meant he had only "enough stuff to fill 5 per cent. of the orders we were then getting." But the explanation does not seem to explain the language of the letter. At the close of the year 1917, Brown's debts exceeded $1,000,000, and his accounts payable were about $49,000. He had borrowed from the Amos Brown Estate about $500,000, and he owed to various banks and other creditors for loans $424,000. He testified that the money obtained on the most of these loans went to the Amos Brown Estate.

[1] In determining whether one is chiefly engaged in farming,

all his activities are to be taken into consideration. American Agricultural Co. v. Brinkley, 194 Fed. 411, 114 C. C. A. 373, Ann. Cas. 1915C, 100; Harris v. Tapp (D. C.) 235 Fed. 918. It is proper to consider the relative amount of time he devoted to the several lines of endeavor in which he was interested, and it has been held that the comparative amount of revenue received from each may be taken into account, as well as the relative amount of indebtedness which he has incurred in his different lines of business. Hart-Parr Co. v. Barkley, 231 Fed. 913, 146 C. C. A. 109; In re Disney (D. C.) 219 Fed. 294. One who is engaged chiefly in farming is within the exception, although as incidental thereto he raises live stock for sale and engages extensively in the creamery and poultry business. In re Thompson (D. C.) 102 Fed. 287; Gregg v. Mitchell, 166 Fed. 725, 92 C. C. A. 415, 20 L. R. A. (N. S.) 148, 16 Ann. Cas. 510. But it is otherwise if the incidental business assumes such proportions as to become the principal business. Bank of Dearborn v. Matney (D. C.) 132 Fed. 75. And one who is engaged chiefly in farming is within the exception, although he may be engaged in other lines of business of less importance wholly disconnected with farming. Couts v. Townsend (D. C.) 126 Fed. 249; Wulbern v. Drake, 120 Fed. 493, 56 C. C. A. 643.

[2] With these principles in view, we are not convinced that the evidence is such as to justify us in disturbing the conclusion of the court below. The main portion of Brown's debts were incurred on behalf of the Amos Brown Estate, and a very considerable portion of his time, especially during the year 1917, was devoted to the business of that estate. In addition to that, the evidence indicates that Brown's principal interest at the farm was in developing the business of his packing house, creamery, and poultry yards, and in purchasing live stock and poultry from others, and selling directly to consumers the products of his plants. In re Brown (D. C.) 132 Fed. 706; In re Mackey (D. C.) 110 Fed. 355; In re Disney (D. C.) 219 Fed. 294.

The judgment is affirmed.