## In re BROWN.

(District Court, E. D. Missouri, S. E. D. March, 1922.)

1. Bankruptcy ⬤➡68—"Farming" and "tillage of the soil," in Bankruptcy Act, synonymous.

"Farming" and "tillage of the soil," as used in Bankruptcy Act, § 4b (Comp. St. § 9588), are synonymous.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Farming.]

2. Bankruptcy ⬤➡67—Status of alleged bankrupt taken as of date of acts of bankruptcy.

The status of an alleged bankrupt, as whether or not he is subject to the act, is to be determined as of the date of the acts charged as acts of bankruptcy.

3. Bankruptcy ⬤➡68—Person engaged chiefly in farming.

In determining whether or not an alleged bankrupt was engaged chiefly in farming, and so exempt from adjudication, whether his financial difficulties and his indebtedness arose from farming operations or from other business enterprises is a consideration to be regarded.

4. Bankruptcy ⬤➡68—Alleged bankrupt held not "farmer."

The alleged bankrupt owned some 4,500 acres of farm lands, on which resided tenants from whom he received, in lieu of rent in cash, one-half the crops raised less a deduction for one-half the feed used and one-half the expenses of threshing, regardless of whether the farming operations for the year were profitable or the reverse. While he devoted the larger part of his time to the overseeing of his farms, he resided in town, was an officer, manager, and stockholder of a large milling and grain corporation, through which most of his indebtedness was incurred, and also interested as stockholder or partner in various other business enterprises. Held, that he was not a farmer, nor a partner in farming, but was subject to involuntary proceedings in bankruptcy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Farmer.]

In Bankruptcy. In the matter of E. Lindsay Brown, alleged bankrupt. Trial to court on involuntary petition. Adjudication granted.

Appeal dismissed, Brown v. Bank of Chester (C. C. A.) 284 Fed. 1014.

Oliver & Oliver and O. A. Knehans, all of Cape Girardeau, Mo., and James C. McDowell, of Charleston, Mo., for petitioning creditors.

Carter, Collins & Jones, of St. Louis, Mo., and J. M. Haw, of Charleston, Mo., for alleged bankrupt.

FARIS, District Judge. Petitioning creditors, in the number required by statute and holding provable claims, filed an involuntary petition in this court for the adjudication as a bankrupt of one E. Lindsay Brown. The latter by answer defends upon the ground that he is not adjudgeable as a bankrupt upon an involuntary proceeding, for that he is a farmer, within the purview of section 4 of the Bankruptcy Act, as amended (Comp. St. § 9588). Upon this issue a trial was had before the court. By timely admissions, other necessary or jurisdictional matters were eliminated, so that the sole question presented and now remaining in the case is whether the acts, dealings, occupation, and business of Brown render him exempt under the statute from adjudication in this sort of proceeding.

The statute invoked, in so far as it is apposite, reads thus:

"Any natural person, except * * * a person engaged chiefly in farming or the tillage of the soil, * * * may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act."

This statute is fairly plain. The facts alone are troublesome always, and in the case at bar peculiarly so, because of their involution, and of the many and diverse activities, dealings, and interests of the alleged bankrupt.

[1, 2] Whatever other courts may have said, and whatever the language of the statute and the logic of the situation may seem to mean or infer, it has been held in this jurisdiction that the word "farmer" and the term "tillage of the soil" are synonymous, as these definitions are found in the statute under which this proceeding was brought. Hart-Parr Co. v. Barkley (C. C. A. 8th Cir.) 36 Am. Bankr. Rep. 540, 231 Fed. 913, 146 C. C. A. 109. So involved is the case upon the facts that nomenclature may be of importance, if not decisive; also it seems to be fairly well settled that the status of the alleged bankrupt is to be determined as of the date at which the act or acts of bankruptcy were committed. In re Disney (D. C. Md.) 33 Am. Bankr. Rep. 656, 219 Fed. 294; Flickinger v. Bank (C. C. A. 6th Cir.) 16 Am. Bankr. Rep. 678, 145 Fed. 162, 76 C. C. A. 132; Counts v. Columbus Buggy Co. (C. C. A. 4th Cir.) 31 Am. Bankr. Rep. 312, 210 Fed. 748, 127 C. C. A. 298; In re Mackey (D. C. Del.) 6 Am. Bankr. Rep. 577, 110 Fed. 355; In re Luckhardt (D. C.) 101 Fed. 807; Virginia Chemical Co. v. Shelhorse (C. C. A. 4th Cir.) 35 Am. Bankr. Rep. 720, 228 Fed. 493, 143 C. C. A. 75. Harris v. Tapp (D. C. Ga.) 37 Am. Bankr. Rep. 564, 235 Fed. 918.

Brown, the alleged bankrupt, resided in the town of Charleston on the 27th day of August, 1921, when acts of bankruptcy were committed by him, and had resided therein all his life. He owned on this day the equities in some 4,000 to 4,500 acres of farming lands, practically all of which were in cultivation. These lands were in a number of separate parcels, and it is probable that his residence in town was, as to these several parcels of lands, an approximately central location. He began his business life as an assistant cashier in a bank, but, having acquired some 450 acres of land, resigned in 1898 and began devoting his time, efforts and energies toward other pursuits, among which were (a) buying lands, clearing them, improving them, and causing them to be farmed, on what some of the witnesses call the "co-operative plan"; (b) engaging as a partner and afterwards as manager of a corporation in the buying and selling of grain; (c) engaging as a partner with another in the business of operating a dairy; (d) manager and vice president and owner of stock to the amount of more than $40,000 par value in the Charleston Milling Company; (e) vice president and director and owner of $10,000 par value of stock in a bank; (f) owner of stock of the par value of $5,000 in each, and director in two mercantile concerns; (g) owner of stock of par value of $1,000 in an abstract company; (h) partner in a real estate deal wherein some 3,000 acres of land were bought and held for investment or sale.

On August 27, 1921, Brown owed in round numbers about $525,000. Of this sum, about $275,000 was evidenced by notes secured by mortgages upon his 4,500 acres of land; and of this latter sum about $175,000 accrued apparently from either the balances on the purchase price of these lands, or expenses of improving them and putting them into cultivation. The remaining $100,000 seems to have been borrowed in April, 1921, and used perhaps in paying debts owed by the Charleston Milling Company, which he had assumed. The sum of about $200,000 was largely for debts of the Charleston Milling Company, assumed by Brown. The sum of $50,000 was for one-third of the indebtedness of the real estate partnership called the Windyville Farms. However, since at least one of Brown's partners in this latter business is said to be insolvent, his obligations are to be increased by at least $25,000. So, for the purpose of this proceeding, it was admitted that Brown was insolvent on the date next below mentioned.

Being so insolvent, he executed on the 27th day of August, 1921, (a) a deed of trust, securing some $200,000, and conveying in trust for a part of his creditors all his lands, and (b) articles of incorporation of the Brown Farm & Stock Company, which had the effect to convey to the company so formed all of his farming tools, implements, live stock, and practically all other of his personal property and chattels. And on the 6th of September, 1921, he leased to the Brown Farm & Stock Company all of his lands. This was two days after the deed of trust was put on record. Since the 6th day of September, 1921, Brown has been the president and manager of the Brown Farm & Stock Company, of which he owns 244 of the 250 shares. October 7, 1921, he conveyed, by a second deed of trust, some 500 acres of land which were omitted in the deed of trust of August 27, 1921, in order, as it is recited, therein to correct such error of omission; but this latter deed omits to mention and fails to secure some 10 creditors who are named in the first deed of trust and to whom he is indebted in about the aggregate sum of $36,000.

In 1918, Brown and others incorporated the Brown-De Field Grain Company, in which he owned $15,000 par value of the stock, and of which he was manager at Charleston, while De Field was manager at East Prairie, each at a salary of $100 per month. This corporation succeeded the Brown-De Field Grain Company, which as a copartnership had been operating since 1911. This concern did an annual business of some $1,500,000, or more, and purchased and sold one-half, or more, of all the grain produced in Mississippi county, Mo. In 1919 the Brown-De Field Grain Company consolidated with the Charleston Milling Company, and Brown, as the holder of $40,500 par value (approximately one-third) of the stock, became vice president and manager of the grain business thereof.

The Charleston Milling Company operated a large flouring mill in Charleston, a cotton gin in East Prairie, various warehouses, three elevators, and it bought and sold grain, as its other component company had done before the consolidation. It had branch sales offices in Pine Bluff, Ark., and in Memphis, Tenn., and branch purchasing offices, whereat it bought much wheat, in St. Louis, Kansas City, and Chicago.

In 1919 it seems to have done a business of some $3,000,000. This company got into financial difficulties in the early part of 1921, and ceased to be a going concern and was adjudicated a bankrupt September 28, 1921. In trying to tide it over its financial troubles, Brown assumed from $175,000 to $180,000 of the debts of the Charleston Milling Company, and relieved, on some obscure consideration (I gather he took over their stock) other chief stockholders—Clarence De Field and T. J. Johns—of $132,000 and $30,000, respectively, of like obligations. Inferably, he paid some $100,000 of these sums from the $100,-000 which he borrowed on his lands in April, 1921. Approximately two-thirds of the debts now owed by Brown accrued from his dealings in the consolidated grain and milling business; of the balance, $75,000 or more accrued from the real estate deal in the Windyville Farms partnership. So that, from these two sources alone, which confessedly are not farming, he came to owe some $325,000 of his present indebtedness. In the view I take of the case accuracy in the statements of amounts is unnecessary; so I have not tried to be mathematically correct in the figures given.

The record shows that, for 10 or 15 years before Brown became insolvent, by far the largest part of his time was spent in looking after his farms. He did not cultivate these lands himself; that is, he did no work manually, except in the negligible instances of 2 half days' work in some 15 years; nor did he cultivate these lands in late years with hired labor. Just before the 27th of August, 1921, he planted some peas on some 160 acres of this land, using hired labor. Since the lease to the Brown Farm & Stock Company, he has, as manager and president thereof, taken over some 490 acres of this land, which the Brown Farm & Stock Company is actually farming with hired labor.

Upon the remaining 4,000 acres of land there are various tenants, who farm on what is called in the record the "co-operative plan." Some distinction was attempted to be drawn by the witnesses as between the co-operative plan and the ordinary "tenancy upon shares," or "farming on shares." The co-operative plan, as explained by the witnesses, involved a contract between Brown and the tenant, whereby the tenant lived upon the land and furnished all teams, tools, implements, and labor and one-half of the threshing expenses and feed (which latter as a rule was raised on the farm), while the landlord furnished the land and bore the other half of the expenses of threshing and feed. The tenant delivered the produce to the market, and the tenant and Brown divided equally the price for which the produce was sold. Brown consulted and advised with his tenants as to crops to be planted and as to rotation of crops. So far as the record discloses, the tenant was not a partner of Brown in a legal sense; i. e., in the sense that Brown assumed, or in any way became liable for, any debt made or incurred by the tenant in furnishing labor, tools, implements, teams, or other portion of the things agreed to be furnished by the tenant; neither did Brown share the losses with the tenant, if the cost of labor was greater than the value of the crop raised; nor was Brown's moiety at all contingent upon the making of actual profits. In looking after the tenants so engaged in cultivating these lands, by far the lar-

ger part of Brown's time was spent; for while he was manager of the grain company, and of the grain-buying end of the milling company, and while his clerks and subordinates seem to have consulted him and advised with him as to all purchases of any magnitude, only some one-fourth of his time was taken up in this work.

[3] There is no manner of doubt upon the record that the financial difficulties of the alleged bankrupt do not arise from his so-called farming side or phase. Conclusively they arose from his grain and milling business and from his real estate speculation, and by far the greater part of his indebtedness was so incurred. This is a consideration to be regarded. In re Brown (C. C. A. 9th Cir.) 42 Am. Bankr. Rep. 452, 253 Fed. 357; In re Disney (D. C. Md.) 33 Am. Bankr. Rep. 656, 219 Fed. 294; Hart-Parr Co. v. Barkley (C. C. A. 8th Cir.) 36 Am. Bankr. Rep. 540, 231 Fed. 913.

[4] On the other hand, there is likewise no doubt that by far the larger part of his assets were invested in farm lands, tools, implements, and live stock. Contemporaneously, however, with the execution of the conveyance which constitutes at least one of the acts of bankruptcy shown in evidence, Brown conveyed all this personal property to the Brown Farm & Stock Company. If the case, then, is to ride off upon the consideration of the relative amounts of assets involved, and time devoted by Brown to his many investments and activities, rather than to the liabilities incurred by him in these activities, he must be held to be a farmer. But to my mind the nature of his activities, so far as the looking after his farms is concerned, does not constitute him a farmer, but merely makes him an investor in farm lands. He had nothing to do with actually tilling the soil. If his tenant was compelled to expend, in teams, labor, tools, and implements, far more than the whole crop produced was worth, nevertheless, Brown took one-half of what was raised on the farm, subject only to a deduction of one-half of the feed and other negligible expenses. He, in effect, took produce as rent, instead of cash, and he was not farming, but only held large investments in farm lands, to which, as one interested would naturally do, he gave much of his attention. In the earlier years of his investing in lands, it was seemingly necessary to clear, fence, put into cultivation, and improve these lands, so that crops could be grown upon them; this required much attention, as was to be expected, but this phase of attention can scarcely be called farming or tilling the soil. It is but putting wild lands into a condition fit for tillage. When it became possible to cultivate these lands, the so-called system of co-operative farming was carried on by Brown, as and in the manner already stated. His tenants seem to have continued with him on the basis mentioned for years.

I have found no case, nor has any been called to my attention by the diligence of counsel, which characterizes the manner of dealing with farm lands pursued and carried on by Brown as either farming or tillage of the soil. The cases of In re Driver (D. C. N. J.) 42 Am. Bankr. Rep. 106, 252 Fed. 956, In re Disney (D. C. Md.) 33 Am. Bankr. Rep. 656, 219 Fed. 294, and In re Leland (D. C. Mich.) 25 Am.

Bankr. Rep. 209, 185 Fed. 830, however, by analogy at least, lend some countenance to the view I am constrained to take.

As is to be expected, there exists no hard and fast rule by which, inevitably, it may be determined whether one sought to be adjudicated a bankrupt is or is not a farmer. Each case must be determined by its own peculiar facts. If every contradicted question of fact be found in favor of the theory that Brown was a farmer when the act or acts of bankruptcy here relied on were committed, I am yet constrained to find, on facts which are not disputed, that he was merely one who held large investments in farming lands, which lands were in broad effect rented to tenants actually residing on the lands, and from whom he received, in lieu of rent in cash, one-half of the produce grown upon these lands. Whether, if there had been thoroughgoing partnerships existing between Brown and his several tenants as to the farming operations, this would have served to change the rule, I need not here decide, for such is not the fact. Barring one-half of the feed, which was, as a rule produced on the farm, and likewise one-half of the somewhat negligible expenses of threshing the grain, when threshing was necessary, Brown paid no expenses, took no risks, and, except upon the contingency of a total crop failure (in which event he lost only the feed he furnished), could suffer no losses. In this situation, even if there were no other facts, I am not able to find that Brown was a farmer. He was not even a partner in the farming business. Donnell v. Harshe, 67 Mo. 170; Musser v. Brink, 68 Mo. 242.

It results that the issue, mooted upon the hearing, should be found in favor of petitioners and against the alleged bankrupt, and an order adjudicating the alleged bankrupt as such may be entered, and the case thereupon referred generally to the referee in bankruptcy.