## In re MACKLEM.

District Court, D. Maryland. November 2, 1927.

No. 5082.

1. **Bankruptcy ⬡�península76(3)—That creditors endeavored to induce debtor to make assignment for creditors held not to estop them from filing involuntary bankruptcy petition.**

That creditors proposed that debtor might best get back "on his feet" by appointing them a committee temporarily to manage his affairs *held* not to estop them from filing involuntary bankruptcy petition against him.

2. **Bankruptcy ⬡➪76(2)—Creditor, receiving voidable preference, may join in involuntary bankruptcy petition, but may not be counted, unless he surrenders preference (Bankruptcy Act, § 59b [11 USCA § 95]).**

Under Bankruptcy Act, § 59b (11 USCA § 95), a creditor, who has received a voidable preference, may join in involuntary bankruptcy petition against debtor, though he may not be counted as one of the required three petitioning creditors, unless he surrenders his preference.

3. **Bankruptcy ⬡➪76(2)—Payments within four months before filing involuntary petition held not "preferences," disqualifying creditors receiving payments from filing petition; "insolvency."**

Payments by debtor to creditors on account, and on notes made within four months before filing of involuntary bankruptcy petition, *held* not "preferences," so as to disqualify creditors receiving payments from filing petition; no showing being made that debtor was insolvent when payments were made, proof that he was in financial difficulties not being equivalent to "insolvency."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Insolvency—Insolvent.]

4. **Bankruptcy ⬡➪76(2)—Debtor's intent in making alleged preferential payment controls on issue of creditor's disqualification to file involuntary petition.**

On issue whether creditor has been disqualified from filing involuntary petition because of having received preference within four months of filing of petition, intent of debtor in making alleged preferential payment, and not intent of creditor, controls.

5. **Bankruptcy ⬡➪68—Whether debtor was farmer, exempt from involuntary bankruptcy, is fact question, depending on relative importance of his activities, when alleged act of bankruptcy was committed (Bankruptcy Act, § 4b [11 USCA § 22]).**

Whether debtor was chiefly engaged in farming, and therefore exempt from involuntary bankruptcy adjudication, under Bankruptcy Act, § 4b (11 USCA § 22), is a question of fact, to be decided on the circumstances of particular case, and the relative importance of all his activities at the date of the act charged as an act of bankruptcy.

6. **Bankruptcy ⬡➪91(1)—Burden of proving that debtor is not exempt as farmer from involuntary bankruptcy is on petitioning creditors (Bankruptcy Act, § 4b being [11 USCA § 22]).**

Burden of proving that debtor is not a farmer, exempt from involuntary bankruptcy under Bankruptcy Act, § 4b (11 USCA § 22), is on petitioning creditors.

7. **Bankruptcy ⬡➪91(2)—Evidence held to show that debtor was not chiefly engaged in farming, and therefore not exempt from involuntary bankruptcy (Bankruptcy Act, § 4b [11 USCA § 22]).**

Evidence *held* to show that debtor, operating a canning factory and farm, was not chiefly engaged in farming, and therefore not exempt from involuntary adjudication in bankruptcy, under Bankruptcy Act, § 4b (11 USCA § 22).

In Bankruptcy. Involuntary bankruptcy proceedings by the Havre de Grace Banking & Trust Company and others, against John W. Macklem. Decree for petitioners, adjudging respondent to be an involuntary bankrupt.

Lee I. Hecht, of Baltimore, Md., for petitioning creditors.

E. H. Young, of Baltimore, Md., and John S. Young, of Bel Air, Md., for defendant.

COLEMAN, District Judge. This case arises upon an involuntary petition for an adjudication of bankruptcy, and an answer thereto which asserts that the individual sought to be so adjudicated is exempt by virtue of section 4b of the Bankruptcy Act (11 USCA § 22), because a farmer.

The petition was filed August 22, 1927, against John W. Macklem by three creditors, the Havre de Grace Banking & Trust Company and two individuals. It alleges that Macklem is a canner of corn and tomatoes, is insolvent, and within four months preceding the filing of the petition, namely, on August 9, 1927, committed an act of bankruptcy, in that he then made a deed of trust of all his property for the benefit of creditors. The petition is otherwise sufficient on its face. Macklem, in his answer, denies that he is a canner, and alleges, first, that he is a person chiefly engaged in farming or tilling of the soil, and thus exempt; second, that the petitioning creditors have been preferred within four months of the filing of the petition, and are therefore disqualified; and, third, that one of these creditors, the Havre de Grace Banking & Trust Company, is estopped from filing the petition, because it endeavored to induce the respondent to make a general assignment to it, or its nominee, for the benefit of his creditors.

[1] Taking up first the question of estoppel, it seems clear that this is entirely without merit. There is evidence that the secretary of the Havre de Grace Banking & Trust Company, together with the president of another creditor bank, proposed to respondent that he might best get back "on his feet" by appointing them a committee, temporarily, to mange his affairs. But there was nothing improper in this, or nothing inconsistent with the trust company's present position.

[2] As to the matter of disqualification of the three petitioning creditors, Bankruptcy Act, § 59b (11 USCA § 95), provides that "three or more creditors who have *provable* claims against any person * * * may file a petition to have him adjudged a bankrupt." Under some of the decisions, "provable" is held to mean any claim which might be proved, whether preferred or not; while other cases hold that it is the equivalent of "allowable." See In re Standard Detroit Tractor Co. (D. C.) 275 F. 952, 954. But the weight of authority is that a creditor, who has received a voidable preference, may still join in the petition, though he may not be counted as one of the required three petitioning creditors, unless he surrenders his preference. Stevens v. Nave-McCord Co. (C. C. A.) 150 F. 71; In re Gillette (D. C.) 104 F. 769; Canute S. S. Co. v. Pittsburg Coal Co., 263 U. S. 244, 44 S. Ct. 67, 68 L. Ed. 287; In re Cooper (D. C.) 12 F.(2d) 485. As was said in the Stevens Case, page 76:

"The evil of preferences which the bankrupt law was enacted to remove, the remedy of an equal distribution of the property of the bankrupt which it was passed to provide, the prohibition of the use of their claims by preferred creditors until they surrender them, which the act contains, the general scope of the law and all its provisions read and considered together, and the duty to give to it a rational and sensible interpretation, have forced our minds to the conclusion that it was the intention of Congress that creditors who hold voidable preferences should not be counted either for or against the petition for an adjudication in bankruptcy until they surrender their preferences. This intention, thus deduced, must therefore prevail over the technical rules of construction which counsel for the appellees invoke. The result is: A creditor who holds a voidable preference has a provable claim in the sense that he may make and file the formal proof thereof specified by the bankruptcy law; but he may not procure an allowance of his claim, he may not vote at a creditors' meeting, and he may not obtain any advantage from his claim in the bankruptcy proceeding before he surrenders his preference.

"Such a preferred creditor may present or may join in a petition for an adjudication of bankruptcy. But he may not be counted for the petition unless he surrenders his preference before the adjudication. In re Hornstein (D. C.) 122 F. 266, 273, 277; In re Gillette (D. C.) 104 F. 769."

[3] The question, therefore, becomes whether the petitioners, or any of them, have received voidable preferences, there being only the minimum number of petitioning creditors, three. The preferences alleged in the answer are that on May 2, 1927, Macklem paid to one of the individual petitioners $59 on account, and on July 11, 1927, to the other individual petitioner $133.59 on account; these petitioners knowing Macklem was then insolvent. As to the third petitioner, the Havre de Grace · Banking & Trust Company, the claim is that it was preferred by the payment on July 16, 1927, of a note for $206.20, dated May 6, 1926, and also by payment of interest about the same time on another note which it held for $10,000.

[4] The court does not think that any of these payments can be called preferences. It does not appear that the debtor was actually insolvent at the times the payments were made. True, he was in financial difficulties; but that is not the equivalent of insolvency. Indeed, on July 5, 1927, 11 days prior to the last payment, at a meeting of the directors of the Havre de Grace Banking & Trust Company, it was their opinion, after examining Macklem's assets and liabilities, that he was not then insolvent. But the intent of the creditor to whom the alleged preferential payment is made is not material. It is the intent of the debtor that controls. In re Truitt (D. C.) 203 F. 550. Macklem seems to have had no intent to prefer the parties paid, over his other creditors; also payments of currently maturing liabilities in such comparatively small amounts as these are probably not preferential payments in any event. In re Columbia Real Estate Trust Co. (D. C.) 205 F. 980; Houchin Sales Co. v. Angert (C. C. A.) 11 F.(2d) 118.

[5, 6] The real point in the case, then, is narrowed down to the single question of whether Macklem was a farmer or tiller of the soil. This is a question of fact, to be decided upon the circumstances presented by each case. In re Driver (D. C.) 252 F. 956; In re Sutter (D. C.) 270 F. 248; In re Brais (C. C. A.) 15 F.(2d) 693. Whether he is exempt must be determined by considera-

tion of the relative importance of all of his activities at the date of the act charged as an act of bankruptcy. In re Disney (D. C.) 219 F. 294; In re Brown (C. C. A.) 253 F. 357; In re Brown (D. C.) 284 F. 903. The burden of proving that he is not within the exempt class is upon the petitioning creditors. In re Brais, supra; Smith v. Bank of Brownsville (C. C. A.) 15 F (2d) 792.

[7] With this outline of the legal considerations to be borne in mind, the facts now must be analyzed. Mr. Macklem's father had operated the cannery here involved for a number of years prior to his death in 1924. Thereupon the son took over the business. He greatly improved and enlarged the plant in 1925, preparatory to the canning season of that year. He owns two farms, and a 10-acre tract upon which his house is situated. His sisters own three farms, upon one of which the canning factory is situated. Up to and including the year 1925, all five farms were devoted almost exclusively to the raising of sugar corn, all of which was destined for the canning factory. In addition, outside corn crops were purchased. The business had an increasing output till it reached its peak in 1925, with a pack of 50,000 cases, a large production. Since then the factory has not been operated. The major portion of this pack was not disposed of in 1925; the respondent testifying that only 8,000 or 10,000 cases were sold then. With about 40,000 cases on hand at the opening of 1926, Macklem naturally made no preparations to can that year, and so testified, there being no market for what he already had on hand. At the beginning of 1927, due to general overproduction, he still had unsold 17,000 or so cases, which were disposed of in various lots, till at the date of the deed of trust, August 9, 1927, there were 5,600 left.

His farming activities during 1926 and 1927 were as follows: One of his farms was let to a tenant on shares, who had been there a number of years, engaged solely in raising sugar corn, all of which went to the cannery. It contains 118 acres, 30 acres of which have been under cultivation for the last two years. The other farm, of 122 acres, is in charge of a tenant, who has been upon it for 10 years. In 1926, 18 acres of it were planted in corn and tomatoes, and about the same acreage was under cultivation in 1927. The 10-acre home site was not cultivated in either year, though hay crops have been cut periodically. Of the sisters' three farms, aggregating about 700 acres, he had only a half interest in 61 acres, which are part of the 200-acre farm on which the sisters live, and which Mr.

Macklem cultivates. He had no interest in the other two farms. He acted as overseer for them, but without compensation. They were cultivated by tenants secured by him. It appears, therefore, that out of nearly 1,000 acres of land, for the past two years, he has had a financial interest in little more than 100 cultivated acres. Nevertheless he testified that during this time he worked all day the year round on the farms with his men.

All of the respondent's substantial obligations appear to have been incurred in 1925, and his substantial creditors testified that they dealt with him as a canner. So it was with the Havre de Grace Banking & Trust Company, which has a claim of $12,206.20. His statement of liabilities shows $20,500.33 (the largest item) to be due for "cans, cases, machinery, fertilizer, and notes," which were proved to have accrued in his best year, 1925, or thereabouts. Another item is $8,203.77, "due farmers, garages, and hardware stores." At least a part of this was proved to be for corn crops purchased from farmers for the cannery. $9,000 is represented as due the First National Bank of Havre de Grace. At least $4,000 of this accrued in 1925 for fertilizer used on one or more of the five farms that year, to help produce the crop that was last canned. It appears, therefore, that the major portions of his indebtedness were incurred in connection with the canning business, which fact is very significant. Mr. Macklem's statement to the trust company was rendered upon stationery headed with the words "Grower and Packer of Fancy Shoe Peg Corn." He testified that he was using some old stationery, adopted in 1925. However, we have an admission from his own lips that the idea of resuming operations in the canning plant in 1928 was not remote from his mind:

"Q. Was there any provision made, or who suggested that you can in 1928? A. Well, I believe they all talked of that, and I told them, 'All right;' they could go ahead and fix up an agreement, and if they could prove to me where I could come out in canning again, I would gladly go with them; but they never talked any more about me canning."

This is corroborated by other testimony:

Mr. Hecht: "The board (of the Havre de Grace Banking & Trust Company) met at 10 o'clock that day. Mr. Macklem was outside, and I invited him in; he sat to my right; the full board was there, and we discussed his financial condition. He said that, on account of the bad condition of the canning

industry, the market price, he had been unable to do anything, and he was so worried he did not know what to do; he thought of making a deed of trust, or something of that sort; *there was no money in farming, and the only chance he had of making any money was in canning, and he had not done much farming for quite a long while, and canning was the only industry by which he could make money.*"

A number of farmers from the community in which he lived testified that, from their observation of Macklem's activities, he was a farmer in 1926 and 1927. However, on cross-examination, they admitted knowledge of the existence of his canning plant, but said they had never had occasion to investigate the extent of the business. On the other hand, all the witnesses who were acquainted with Macklem in a business way testified that they regarded him as a canner.

Summarizing all the evidence, the conclusion is inescapable that Macklem was chiefly engaged in canning in 1927, at the date of the alleged act of bankruptcy. The only reasonable inference is that the farming that he did was subsidiary to, and primarily as a "feeder" for, his canning business. He was a specialist in canned corn. Canning was of principal concern to him. He relied upon it chiefly for a livelihood. His business increased till 1925, when, due to a general overproduction and consequent fall in the market, he was unable to realize on his products. Since then, actual packing of more goods has been suspended, and he has sought to sustain himself by disposing of what he has had on hand, doing a small amount of farming on the side, till a more favorable turn of affairs would enable him to reopen his factory. This is further proved by the fact that his cannery has always remained ready for operation. There is no testimony of an endeavor to dispose of it, and he has never so far abandoned it as to return to planting his farms, to any extent, with the usual crops grown by the average general farmer.

In the case of In re Mackey (D. C.) 110 F. 355, it was said (pages 358 and 359):

"*A person engaged chiefly in farming is one whose chief occupation or business is farming. The chief occupation or business of one, so far as worldly pursuits are concerned, is that which is of principal concern to him, of some permanency in its nature, and on which he chiefly relies for his livelihood or as the means of acquiring wealth, great or small.* That one may principally devote his physical exertions or his time to a given pursuit, while one of the factors entitled to consideration, is not in all cases determinative of the question whether that pursuit is his chief occupation or business. One may own, reside on, and operate a farm, and at the same time be engaged in the business of buying and selling stocks and other securities. The latter occupation may consume only an hour or two, and the balance of the day be devoted by him to his farm; yet it does not follow that his chief occupation or business is not dealing in stocks or other securities. *If such dealing is of principal concern to him, and chiefly relied on by him for his subsistance and financial advancement, and if he treats it as of paramount importance to his welfare, he would not be within the category of persons chiefly engaged in farming, even were his farm to yield him some profit. Nor does the amount of capital invested necessarily determine in all cases what one's chief occupation or business is. It, like the amount of time devoted, is undoubtedly a factor to be considered, but often is not conclusive.* One may erect a palatial residence in the country, and own the farm on which it stands. It becomes part of the farm, and the farm may be skillfully operated, and yet not yield in profits a hundredth part of the interest on the investment. The owner may be engaged in profitable manufacturing or mercantile pursuits, which enable him to pay in full the cost of his house, and thereafter maintain it from the profits on his business capital, though less than such cost. No one would in such case contend that the owner of the farm was chiefly engaged in farming, because most of his capital was invested in it. It is evident that it is impracticable, if not impossible, to define with precision the facts which will in all cases determine whether one is engaged chiefly in farming, and that each case must be decided on its own circumstances. It may, however, legitimately be stated, generally, that, if it appears in a given case that one's occupation or business which is of principal concern to him, not ephemeral, but of some degree of permanency, and on which he mainly relies for his livelihood and financial welfare, be other than farming, he is not 'a person engaged chiefly in farming.'*" (Italics inserted.)

Similarly Judge Rose, in an extremely well-considered leading case, In re Disney, supra, said (page 300):

"The relative amount of time which a man devotes to various lines of endeavor in

which he is interested is doubtless one circumstance to be taken into account. In the case at bar there is no question that the defendants spent more time in their farming than in their canning. That circumstance is, however, not necessarily decisive. Many men may use or waste the larger part of their working hours in looking after some enterprise which is of relatively little pecuniary importance to them or others. From the standpoint of the Bankruptcy Law, it would not be accurate to say that they were chiefly engaged in the prosecution of such a fad. The amount of the financial returns the debtor expects from his various enterprises is one factor to be considered in determining which is the pursuit in which he is chiefly engaged. * * * The defendants now before this court never made any net profits in the canning business. While they were engaged in it, they lived by their farming. Nevertheless they went into it in the not unreasonable expectation that it would prove their principal source of livelihood. Upon no other theory is it possible to explain the fact that they were willing to incur the obligations necessary to prosecute that business upon the scale upon which they undertook to carry it on. Practically all of their relatively large indebtedness was contracted in canning. That might be immaterial, had they definitely withdrawn from the canning business before they committed the act of bankruptcy charged against them. Flickinger v. First Nat. Bank of Vandalia [(C. C. A.) 145 F. 162] supra; In re Leland (D. C.) 185 F. 830; In re Folkstad (D. C.) 199 F. 363. It has already been found as a fact that they had not done so. When a debtor follows two pursuits, the relative amounts of his indebtedness contracted in one and the other may be taken into account as an aid in determining in which he was chiefly engaged. Armstrong v. Fernandez, 208 U. S. 324, 28 S. Ct. 419, 52 L. Ed. 514; In re Mackey, supra; Bank of Dearborn v. Matney (D. C.) 132 F. 75; Tiffany v. La Plume Condensed Milk Co. (D. C.) 141 F. 444; In re Burgin (D. C.) 173 F. 726. By that test the defendants were canners, rather than farmers."

Applying the test, as laid down in these cases, which is believed to be the true one, the court finds that the petitioners have sustained the burden of showing that on August 9, 1927, the respondent was not a person chiefly engaged in farming or tilling the soil.

A decree must therefore be entered, adjudicating him an involuntary bankrupt.